GARY W. GORSKI
Attorney at Law
8549 Nephi Way
Fair Oaks, CA  95628
Telephone:     (916) 965-6800
Facsimile:     (916) 965-6801
email:          usrugby@pacbell.net
GARY W. GORSKI - CBN:  166526

DANIEL M. KARALASH
1207 Front Street, Suite 15
Sacramento, CA 95814
Telephone:     (916) 787-1234
Facsimile:     (916) 787-0267
email: dmkaralash@surewest.net
DANIEL M. KARALASH - SBN: 176422

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT E. HUNTER, D.V.M., individually, and as class representative for all others similarly situated; HOWARD ELEY individually, and as class representative for all others similarly situated;<br><br>            Plaintiff(s),<br><br>vs.<br><br>COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, in his individual and official capacity;  JAN SCULLY, SACRAMENTO COUNTY DISTRICT ATTORNEY in her individual and official capacity; OFFICE OF THE DISTRICT ATTORNEY COUNTY OF SACRAMENTO;  COUNTY OF SACRAMENTO; WILLIAM KEVIN SOWLES, in his individual capacity Does 1 through 100;<br><br>            Defendant(s). | CASE NO.:<br>Temp Case # 06-205<br><br>COMPLAINT FOR:<br><br>1.  42 U.S.C. § 1983 (Excessive force - Plaintiff HUNTER, against unknown Doe Defendant Deputies)<br><br>2.  42 U.S.C. § 1983 (Excessive force - Plaintiff ELEY, against Defendant Sowles)<br><br><u>CLASS ACTION CAUSES OF ACTION</u><br><br>3.  42 U.S.C. § 1983 (PLAINTIFFS, individually, and as class representatives - Excessive Force and Suppression of Speech - Ratification, Custom, Policy and Practice - Defendants COUNTY OF SACRAMENTO SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, in his individual and official capacity, and COUNTY OF SACRAMENTO only)<br><br>4.  42 U.S.C. § 1983 (PLAINTIFFS as class representatives -  Equal Protection - selective enforcement and prosecution (14th Amendment) - Ratification, Custom, Policy and |

Practice - Defendants COUNTY OF
SACRAMENTO, SHERIFF'S
DEPARTMENT; SHERIFF LOU
BLANAS, in his individual and
official capacity; JAN SCULLY,
SACRAMENTO COUNTY
DISTRICT ATTORNEY in her
individual and official capacity;
OFFICE OF THE DISTRICT
ATTORNEY COUNTY OF
SACRAMENTO; COUNTY OF
SACRAMENTO only)

5.   42 U.S.C. § 1985(3) (PLAINTIFFS
as class representatives - Equal
Protection - selective enforcement
and prosecution (14th Amendment)
Conspiracy - Defendants COUNTY
OF SACRAMENTO, SHERIFF'S
DEPARTMENT; SHERIFF LOU
BLANAS, in his individual and
official capacity;  JAN SCULLY,
SACRAMENTO COUNTY
DISTRICT ATTORNEY in her
individual and official capacity;
OFFICE OF THE DISTRICT
ATTORNEY COUNTY OF
SACRAMENTO; COUNTY OF
SACRAMENTO only)

**DEMAND FOR JURY TRIAL**

**F.R.C.P., Rule 38(a)**

Plaintiff alleges:

INTRODUCTION

1.  Plaintiffs, individually, and as class representatives, by and through their

attorneys, GARY W. GORSKI and DANIEL KARALASH, complaining of Defendants jointly

and severally and alleges that Defendants violated certain rights guaranteed under the United

States Constitution by wrongfully and without just cause injuring Plaintiffs by means of the

unjustifiable use of force; in addition, decision making Defendants ratified, implemented and

established a custom, policy and practice of unreasonable use of force since at least the 1980s.

2.   Plaintiffs complaining of Defendants jointly and severally and allege that

Defendants violated certain rights guaranteed under the United States Constitution by refusing to

criminally prosecute Peace Officers for excessive force primarily (and even in cases of Driving

2.

under the Influence), whereby the common citizen is prosecuted to the full extent of the law for the same or similar type of force being applied to the person of another, or for driving under the influence.  Defendants' rationale being that peace officers stand to lose their jobs if convicted of such crimes, and are thus, given preferential treatment.

3.  For example, the case against former Deputy Sowles was dismissed in Superior Court "in the interest of justice," said Deputy District Attorney Don Steed.

4.  However, by dismissing the case in the "interest of justice", dismissal of criminal charge in interests of justice satisfies requirement that the charges were terminated in a manner indicating SOWLES' innocence.  See *Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. (Cal.) 2004).

5.  "Mr. Sowles' conduct was troubling, but it was misdemeanor misconduct and the inmate was not injured," Steed said Thursday. "We are assured that he will no longer be a deputy sheriff in Sacramento County. He's a 15-year veteran who has forfeited his career and his pension - those are pretty serious penalties."

6.  However, such an agreement does not foreclose him to be hired by any other law enforcement agency.

7.  For instance, Defendant SOWLES was not convicted of a battery; therefore, unlike the common class citizen, he is still free to purchase firearms at will because a conviction for battery results in a forfeiture of the right to purchase or possess firearms.

8.  Keeping in mind that Sowles had previously brandished his firearm at citizens off-duty, as reported by the Sacramento Bee.

9.   The same theory for dismissing the criminal case against Sowles, applies equally to most other crimes dismissed against peace officers, such as DUIs and domestic violence cases in particular.

10.  This complaint is prepared and signed by the attorneys representing Plaintiffs, individually, and as class representatives for others similarly situated and such averments are based upon the information and belief of Plaintiffs with the assistance of counsel.

JURISDICTION

3.

1    11.  This action is brought pursuant to 42 U.S.C. §1983 and the First, Fourth and

2  Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded upon 28

3  U.S.C. §§ 1331 and 1341 and the aforementioned constitutional and statutory provisions.

4  <u>VENUE</u>

5    12.  The unlawful actions alleged herein have taken placed within the jurisdiction

6  of the United States District Court for the Eastern District of California.  Venue is proper under

7  28 U.S.C. § 1391(b).

8  <u>PARTIES</u>

9    13.  Plaintiff, ROBERT HUNTER is and was at all times relevant herein a citizen

10  of the United States of America, a Caucasian 52 year old adult male, and residing Sacramento

11  County, California.

12    14.  Plaintiff graduated from UC Davis in 1975 with a B.S., and his D.V.M. from

13  UC Davis in 1979, and has been a licensed veterinary doctor ever since.  But for his arrest for

14  DUI on or September 17, 2005, he has never been arrested or convicted of any crimes.

15    15.  Plaintiff HOWARD ELEY is and was at all times relevant herein a citizen of

16  the United States of America, an African-American male adult, and residing in Sacramento

17  County, California..

18    16.  Plaintiff HOWARD ELEY is and was at all times relevant herein incarcerated

19  in Defendants Main Jail on or about March 21, 2004.

20    17.  Defendant COUNTY OF SACRAMENTO is an incorporated municipality

21  created under the constitution, laws and statutes of the State of California.  COUNTY OF

22  SACRAMENTO, Sheriff's Department is an agency subject to the control of the COUNTY OF

23  SACRAMENTO.

24    18.  Defendant COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT

25  was and is at all times relevant herein a law enforcement agency which employed duly appointed

26  and acting California Peace Officers.

27    19.  At all times mentioned herein, Defendant COUNTY OF SACRAMENTO, by

28  and through it Sheriff's agency, was acting under color of law, to wit, under color of statutes,

4.

1  ordinances, regulations, policies, customs, and usages of the State of California and/or the

2  COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT.

3        20.  Defendant COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT has

4  discretion to refer cases of excessive to Defendant DISTRICT ATTORNEY'S OFFICE for

5  prosecution.

6        21.  JAN SCULLY, SACRAMENTO COUNTY DISTRICT ATTORNEY in her

7  individual and official capacity and the OFFICE OF THE DISTRICT ATTORNEY COUNTY

8  OF SACRAMENTO was acting under color of law, in the preferential treatment in the

9  prosecution of peace officers.

10        22.  Unknown Doe Defendants were employed by the COUNTY OF

11  SACRAMENTO, SHERIFF'S DEPARTMENT, and were at all times mentioned herein,

12  Defendants were acting under color of law, to wit, under color of statutes, ordinances,

13  regulations, policies, customs, and usages of the State of California and/or the COUNTY OF

14  SACRAMENTO.

15        23.  At all relevant times, Defendants, and each of them, conspired to create a blue

16  wall of silence and lies to obstruct justice, thus allowing Department officials to condone an

17  environment in which the most violent Deputies believed they would be insulated from

18  prosecution.

19        24.  Defendants were aware that an inordinate amount of Sheriff's Deputies

20  working at the Main Jail commit crimes of violence upon inmates and detainees, but refuse to

21  properly investigate and prosecute said known acts.

22  **CLASS CERTIFICATION**

23        25.  Plaintiff HUNTER is a proper class representative in that (1) the class is so

24  numerous that joinder of all members is impracticable, (2) there are questions of law and fact

25  common to the class, (3) the claims and defenses of the representative parties are typical of the

26  claims and defenses of the class, and (4) the representative parties will fairly and adequately

27  protect the interests of the class.

28        26.  Plaintiff ELEY is a proper class representative in that (1) the class is so

1   numerous that joinder of all members is impracticable, (2) there are questions of law and fact

2   common to the class, (3) the claims and defenses of the representative parties are typical of the

3   claims and defenses of the class, and (4) the representative parties will fairly and adequately

4   protect the interests of the class.

5          27.  Class certification is proper pursuant to F.R.C.P., Rule 23.

6   <u>FIRST CAUSE OF ACTION</u>
    (42 U.S.C. §1983)

7   (Excessive Force by unknown Doe Deputies - Plaintiff HUNTER in his individual capacity)

8          28.  PLAINTIFF incorporates paragraphs 1 through 11 as though fully set forth

9   herein at length.

10         29.  On or about September 17, 2005, Plaintiff HUNTER was booked in

11  Defendant Sacramento County Main Jail for suspicion of driving under the influence.

12         30.  The arresting officers stated that Plaintiff Hunter was very cooperative and

13  polite, at the time he was being turned over to the custody of Defendants for their care and

14  control of Plaintiff.

15         31.  While at the Main Jail main detox holding center, Plaintiff HUNTER had to

16  relieve himself, but the detox cell toilet was clogged and overflowing causing unsanitary

17  conditions (a common theme).

18         32.  Plaintiff HUNTER signaled to advise the deputies as to the nature of the

19  problem, and to request access to a toilet to relieve himself.  Again, as is typical in the Main Jail

20  detox area, several unknown doe Deputy defendants, for no reason, applied excessive force to the

21  person of Plaintiff causing excessive "popping" sounds emanating from his body, fracturing his

22  elbow, causing nerve damage to his wrist, severe contusions to his legs, tearing and stretching

23  tendons in his extremities. throwing him to the floor, and setting in motion events which forced

24  Plaintiff to fear for his life and safety.

25         33.  Plaintiff requested medical treatment and was denied such treatment.

26         34.  Shortly thereafter, another incarcerated black male was being physically

27  battered, and Plaintiff HUNTER advised the unknown Deputies to "give the guy break" and in

28  threatening tones and gestures, they told Plaintiff HUNTER to shut-up "weasel" and to keep

1    facing the wall.

2         35.  All during this time, Plaintiff feared for not only the life and safety of himself,

3    but others who did nothing wrong to be battered and physically assaulted.

4         36. During the time Plaintiff was being subjected to unreasonable and excessive

5    force, Defendants, and each of them, ratified the conduct of the other Defendant.

6         37.  At no time was it necessary to use force against Plaintiff.

7         38.  In fact, had force not been used against PLAINTIFF, he would not have

8    suffered serious bodily harm; however, since force was used, PLAINTIFF has now suffered and

9    continues to suffer serious bodily harm and permanent injuries.

10        39.  At the time of PLAINTIFF being brutalized, PLAINTIFF was not violating

11   any laws that justified the use of force, nor was he making any overt threats for the use of force

12   that would place a reasonable officer is fear of his safety.

13        40.  At the time of PLAINTIFF being brutalized and subjected to excessive force,

14   Plaintiff was not attempting to interfere with any peace officers execution of their duties and was

15   not engaged in any assaultive behavior towards DEFENDANTS.

16        41.  The excessive force was entirely unjustified by any action of PLAINTIFF and

17   constituted unreasonable and excessive use of force.

18        42.  The direct and proximate result of DEFENDANTS' acts are that PLAINTIFF

19   has suffered severe and permanent injuries including, but not limited to, a fracture of the arm,

20   severe tissue damage, and was forced to and continues to endure great pain and mental suffering,

21   and to incur medical and legal expenses and was deprived of his physical liberty.

22        43.  PLAINTIFF is entitled to an award of attorneys' fees pursuant to 42 U.S.C. §

23   1988.

24        44.  Defendants subjected Plaintiff to such deprivations by either malice or a

25   reckless disregard of Plaintiff's rights.

26        45.  PLAINTIFF is entitled to an award of punitive damages to punish and to deter

27   such conduct.

28        46.  Defendants, under color of state law, subjected Plaintiff to the deprivation of

1  right, privileges, and immunities secured by the Constitution and laws of the United States of

2  America in violation of 42 U.S.C. § 1983.

3          47.  As a direct and proximate result of Defendants, and each of them, conduct

4  with Plaintiff, Plaintiff has been injured according to proof, including, but not limited to, a

5  broken arm, bruises, concussion, lost wages, lost income, lost benefits, damage to his psyche,

6  shock to nervous system and other damages not yet known.  In addition, due to the intentionally

7  inflicted injury, Plaintiff has been damaged.

8                        SECOND CAUSE OF ACTION
                            (42 U.S.C. §1983)

9      (Excessive Force by Defendant Deputy William Kevin Sowles - Plaintiff ELEY in
           his individual capacity)

10

11         48.  PLAINTIFF incorporates paragraphs 1 through 46 as though fully set forth

12  herein at length.

13         49.  On or about March 21, 2004, Plaintiff ELEY was an inmate in Defendant

14  Sacramento County Main Jail.

15         50. Defendant SOWLES assaulted and battered Plaintiff Howard Eley in a main

16  jail classroom on March 21, 2004.

17         51.  The excessive use of force followed a verbal disagreement between Sowles

18  and Eley, according to a case summary filed by the Defendant District Attorney's office.

19         52. The summary specifically states that Sowles shoved, slapped and then choked

20  Eley without provocation.

21         53.  Two other deputies pulled Sowles from Eley's handcuffed and limp body,

22  while a third deputy watched the incident from an elevated control room, according to the

23  summary.

24         54. All during this time, Plaintiff feared for his life and safety.

25         55. During the time Plaintiff was being subjected to unreasonable and excessive

26  force, Defendant was acting under color of law, and in fact, was following typical Sheriff's

27  Department policy for using control holds as a form of punishment.

28         56.  At no time was it necessary to use force against Plaintiff.

           57.  In fact, had force not been used against PLAINTIFF, he would not have

                                    8.

suffered serious bodily harm; however, since force was used, PLAINTIFF has suffered serious bodily harm and injuries to his psyche, including fear of law enforcement.

58.  At the time of PLAINTIFF being brutalized, PLAINTIFF was not violating any laws that justified the use of force, nor was he making any overt threats for the use of force that would place a reasonable officer is fear of his safety.

59.  At the time of PLAINTIFF being brutalized and subjected to excessive force, Plaintiff was not attempting to interfere with any peace officer's execution of their duties and was not engaged in any assaultive behavior toward DEFENDANT.

60.  The excessive force was entirely unjustified by any action of PLAINTIFF and constituted unreasonable and excessive use of force.

61.  PLAINTIFF is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

62.  Defendants subjected Plaintiff to such deprivations by either malice or a reckless disregard of Plaintiff's rights.

63.  PLAINTIFF is entitled to an award of punitive damages to punish and to deter such conduct.

64.  Defendants, under color of state law, subjected Plaintiff to the deprivation of right, privileges, and immunities secured by the Constitution and laws of the United States of America in violation of 42 U.S.C. § 1983.

65.  As a direct and proximate result of Defendant's conduct with Plaintiff, Plaintiff has been injured according to proof.

THIRD CAUSE OF ACTION
(42 U.S.C. § 1983)
(Class Action)
(Defendants - COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, individually and in his official capacity, ratification, custom, policy and practice establishing Monell liability)

66.  Plaintiff incorporates paragraphs 1 through 64 as if though fully set forth herein.

67.  Class Plaintiffs incarcerated in the detox area, especially for 647(f) P.C. (Too intoxicated to take of themselves) or for DUI, are especially attacked by deputies since the

1  deputies have a very low threshold of tolerance for dealing with intoxicated individuals, such as

2  their inability to follow instructions.

3       68.  Deputies take out their frustration and just pummel intoxicated class

4  Plaintiffs.

5       69.  Because of this, this class of Plaintiffs are especially subjected to abuse by

6  Deputies, even when arresting officers had no problem with the class plaintiffs at the time of

7  their arrest.

8       70.  Class plaintiffs also include those subjected to the unnecessary use of

9  tazers/tasers, flash bangs, batons, and other instruments.

10      71.  Class plaintiffs also include those subjected to plain old fashion beatings by

11  multiple deputies on a single incarcerated class Plaintiff.

12      72.  Complaints of excessive force at the Main Jail, and entity Defendants being

13  placed on such notice, date back to the 1980s.

14      73.  While assigned to the old main jail, a Lt. Twomey (now retired) authored a

15  chronicle of events and devoted a whole chapter describing a true factual account regarding the

16  complete lack of management control at all levels at the Main Jail facility.

17      74.  In particular, Deputy Kelley's Morning Watch (the same Sgt., Captain, and

18  now Chief Kelley of the Main Jail at issue in this case and during the time of a Mr. Afshar's

19  injuries there) had amassed more complaints of brutality in 30 days, then the entire patrol

20  division over the entire year.  Page 37 of the published report.

21      75. The copy written manuscript was titled To Take Arms Against a Sea of

22  Trouble, a copy of which is in the Library of Congress (Copyright Registration Number TX 1-

23  088-101).

24      76.  In Chapter B, commencing at page 30, there is documented excessive force in

25  the Correctional Services, and the lack of management oversight.

26      77.  On page 32, Lt. Twomey specifically uses the words that "it was a common

27  pattern" of brutality by deputies in the correctional services division, and that deputies would

28  intentionally leave out facts or distort the facts to always place the blame on the inmate.

10.

78. By way of example, deputies did not take photos or destroyed photos of inmates injuries.

79. Lieutenant Twomey gave this manuscript to then Sheriff Robbie Waters, the Chief Deputy of Security and Correctional Services, Gil Baker,  Main Jail Commander Braxton W. Bonner, and to high ranking management officials in Sheriff's staff services (e.g., then Lieutenant Jon Benbow).

80. Interesting, the then Deputy Bill Kelley, was promoted to Captain and assigned to the Main Jail at the time of the Afshar beating, and is now Chief Deputy of Correctional Services.

81. Hence, since this publication, Sacramento County Sheriff's Department was placed on notice of the pattern of excessive force in correctional services, and in particular, at the Main Jail (old and new).

82. This fact has remained constant, and in particular, under the watch of Kelley.

83. For instance, the Sacramento Bee published a preliminary audit of the Main Jail which was produced by Defendant COUNTY, which shows

    (1)    Across the department, accountability is not adequately stressed, and conflict avoidance "appears to be a cultural norm" in the department.

    (2)    There is inadequate documentation on all use-of-force incidents.

    (3)    The Main Jail accounts for 40 percent of the department's internal affairs investigations.

    (4)    The jail has an insufficient number of safety cells and security beds.

    (5)    Public and staff alike are concerned about inmate suicides and safety.

84. Ironically, the County expended $386,000.00 in tax dollars for an audit that is substandard, and which merely proved Lt. Twomey's assessment in the case of *Afshar v. County,* and his assessment over 20 years ago.

11.

1    85.   More importantly, most reports of excessive force go unreported, and if

2    reported, the officers are exonerated and/or cleared, even in clear cases of excessive force.

3    86.   By reviewing the jail video tapes, it is very evident that nothing has changed,

4    because the same conduct prevalent since the 1980s, and only at the Main Jail, is where the

5    "pattern" still "common".

6    87.   Undersheriff McGinnis ratifies this excessive force in a public broadcast in

7    response to the Afshar case.

8    88.   The Sheriff has given through custom, practice, ratification and usage, the

9    Chief Deputies ultimate decision making authority in determining whether use of force is

10   appropriate.

11   89.   The Sheriff very seldom reviews such videos.

12   90.   "Sometimes", an IA case "may" be referred to the Sheriff for his perfunctory

13   signature only.  However, as the disposition sheets indicate, the Hay file indicates, and the lack of

14   any investigation on the part of the Sheriff regarding Mr. Afshar's complaint which the County

15   admits should have been investigated, it is clear the Captains, and primarily the Chief Deputies

16   make policy regarding the minimum threshold on the use of force, and not the Sheriff.  For

17   examples, see **Plaintiff's Exhibit "10"** (all exhibits referenced are part of the Court's File

18   pertaining to Plaintiff Afshar's Counter Motion for Summary Judgment).

19   91. County of Sacramento Sheriff's Department Deposition Exhibit 2, bate stamp

20   numbers COIA 449 (Chief Lind) compared with 542 "case submitted to Chief for Review" and

21   "case submitted to Sheriff for signature" (and not review). 465, "case submitted to Sheriff for

22   signature" (and not review).  470, "Case summary completed, binder to Capt."  473, "Case to

23   Chief".  474, case goes to captain, and bypasses chief all together to "Sheriff for signature".  478

24   is of particular importance since a watch commander initiated an investigation based upon other

25   deputies complaining that use of force was unnecessary by co-deputy.  The investigation was

26   completed, but the case was "withdrawn" without any oversight from the Sheriff.  489, "awaiting

27   chief deputy review" and "case completed notification mailed."  494, sustained use of force by

28   "chief" only.  495, use of force "exonerated" and the case was closed at the "division" level (see

499).  500, the case of "unfounded" goes from a Lieutenant straight to "legal", bypassing the Chief and the Sheriff.  507, use of force "exonerated" and case closed at "Chief for Review".  579, use of force "exonerated" at the captain level.

92.  Final orders of discipline were issued in the Hay matter, but yet this IA case never went before the Sheriff.  Thus, here again, the Chief Deputies ratified the discipline that was to be imposed, and not the Sheriff – thus, the Chief Deputy assumed the role of the final arbiter of discipline on the use of force as well in this case.  See COIA 513-**515**.  Neither the Sheriff or Undersheriff reviewed this file.  In other words, the final order of discipline came from the Chief Deputy, and not the Sheriff/Undersheriff.  Thus, protocol was not even followed, that was to insulate the Sheriff since litigation was pending.

93.  IA disposition sheets merely confirm what experience with the department's internal affairs operations prove – the Sheriff, if and when he does get an IA file, merely signs off on it and <u>maybe</u>, on a very rare occasion, he may make a modification or recommendation.

94.  The Main Jail use of force policy is the same as those used in all of <u>Correctional Services</u> (for that matter, the entire Department) and use of force and pat downs do not change between facilities.

95.  The policy making officials from South Field Services (Chief Deputy Daniel Drummond) and Correctional and Security Services (Chief Deputy James Babcock) signatures appear on the complete 5-Tab (**Plaintiff's Exhibits "1a" and "1b"**), which did in fact include the video tape.  Captain Bill Kelly, Commander of the Main Jail in 2001, signature also appears on **Plaintiff's Exhibit "1b"**, ratifying the use of force depicted on the video, and who is also a policy and decision maker, though the ultimate authority rests with the Chief when discipline is NOT recommended.  <u>That is why the Sheriff does not involve himself with the ratification of use of force because he specifically charges the Chief Deputy with establishing and implementing the unwritten policy</u>.

96.  From the voluminous disposition sheets attached to the County of Sacramento Sheriff's Department Deposition taken in the Afshar case and the Hay IA file, the Sheriff does not enter the chain of review of excessive force complaints until a final disposition of discipline

13.

is signed, after the Chief Deputy of the Service Area makes his/her final decision that there was excessive force.  See **Plaintiff's Exhibit "2"** attached to the deposition transcript of County of Sacramento Sheriff's Department taken on August 10, 2005, in the case of *Afshar v. County*.

97.  Thus, the Chief Deputy is the de facto official policy maker when it comes to determining what constitutes departmental policy on the use of force, AND NOT THE SHERIFF, except perfunctory signature.

98.  For instance, a Deputy Ramos was appointed in 1999, and by 2001, he was the subject of four IA complaints, 3 involving use of force at the Main Jail (see complaint history COIA 83).  Deputy McCue was appointed in 2000, and by 2001, he was the subject of four IA complaints all involving use of force at the Main Jail (see complaint history COIA 84).

99.  Deputy Black is another example of an officer out of control, and has been involved in multiple excessive force cases which have gone unfounded, dating back to his days at the main jail while a African-American homeless female named Leanna Wright had her arm broken in the detox cell.

100.  Interesting, at the time of the homeless woman Wright's arm being broken, Sgt. Kelley was on duty at the time.

101.  Kelley's history of supervisory skills dates all the way back to the 1980s when his watch at the Old Main Jail had more excessive force complaints in one month than the entire patrol division did for an entire year.

102.  After approximately five deputies testified in the Wright case that they were not sure who broke her arm, and the charges against the deputies were dismissed by the jury, the homeless woman Plaintiff was nowhere to be found, and the Honorable Judge Shubb gave Plaintiff's counsel one year to track her down to hold the county over on the Monell liability claim.

103.  The homeless plaintiff was never found, and the case against the county at that time was dismissed (video did not exist at that time).

104.  With regard to the Hay case, curiously missing is Deputy Charles Meeks complaint history, even though he is the third deputy in the video "pushing" Mr. Hay's head into

14.

1  the wall. COIA 73.

2          105.  Officers were exonerated for the illegal application of force against Hay,

3  even though some were reprimanded for lying and not providing medical treatment.

4          106.  The policy making authority for the Department is vested in what is known

5  as "Office of the Sheriff ", which consists of 1) Lou Blanas, Sheriff, an elected official, 2)

6  Undersheriff, appointed by the Sheriff, Assistant Sheriff, appointed by the Sheriff, and the Chief

7  Deputies, all civil Service positions, (Administrative Services;  Corrections & Security Services;

8  Investigative & Special Ops; and, North & South Field Services).

9          107.  Chief Deputies dictate what the use of force policy is, and not the

10 Undersheriff or Sheriff, because if they declare the use of force acceptable, the issue is seldom

11 brought to the Undersheriff or Sheriff except in those circumstances when a final order of

12 discipline is recommended by the Chief Deputy on the use of force.

13         108.  The reason for this is to politically insulate the Undersheriff and Sheriff

14 from stigmatizing issues of an out of control main jail with inadequate supervision.

15         109.  Hence, only when there is a final order of discipline proposed by a Chief

16 Deputy on the excessive use of force, then and only then does it go to the Sheriff for final review.

17 However, what is unusual is the fact that final orders of discipline that were issued in the Hay

18 matter for disobeying an order to not have contact with other subjects of the investigation

19 regarding the IA interview (Eubanks and Book) AND for not providing Hay with medical

20 treatment (Ramos, Meeks, and McCue), but yet this IA case never went before the Sheriff.  Thus,

21 here again, the Chief Deputy ratified the discipline that was to be imposed, and not the Sheriff –

22 thus, the Chief Deputy assumed the role of the final arbiter of discipline on the use of force as

23 well.  See COIA 513.  In other words, the final order of discipline came from the Chief Deputy,

24 and not the Sheriff.  Thus, protocol was not even followed, and I would hypothesize that it was to

25 insulate the Sheriff since litigation was pending.

26         110.  In the Hay case, Chief Deputy James Babcock authorized "excessive force"

27 at the Main Jail on June 7, 2001 (**Plaintiff's Exhibit "1b"** (i.e. the use of control holds as a form

28 of punishment), thus ratifying a departmental policy as to what constitutes "reasonable force",

15.

1   which is evident in both the Afshar and Constantin videos.

2           111.  Also, Chief Deputy Bill Kelley following the established pattern and

3   practice, and thus ratified past practices of excessive force.

4           112.  In videos of excessive force, Defendants are completely aware of

5   unauthorized control techniques and excessive force, and the use of those techniques as a form of

6   punishment, and not control.  This is not simply blind acquiescence, but in fact is documented in

7   the Hay IA case, and in the Afshar and Constantin case since there will be no investigation

8   initiated by the Sheriff's Department though brought to light by this litigation and the IA

9   complaint Mr. Afshar filed with the Department.

10          113.  A typical example of IA attacking the victims credibility is the matter of

11  Hay.  IA would go out of its way to interview Mr. Hay's roommate and his neighbors, but never

12  interviewed the African-American male deputy who made the punching motion (indicating a

13  beating to take place at about 1:22 on the video) while the intake nurse forewarned Hay that " . . .

14  **Let me give you a word of some advice because I don't want to soak up any more blood**

15  **tonight**" "**come there, you know - cause they like hurt people here.**"  Time on tape all around

16  1:22:03)

17          114.  Further, it was not until the SacBee's article with numerous links to the

18  evidence in cases referenced herein, coupled more importantly with the Defendants' response via

19  Undersheriff McGinnis admission whereby they tacitly ratified the use of force evidenced in

20  videos is justified, though clearly excessive and in violation of the victims rights. See audio

21  recording of Undersheriff McGinnis' response to the Sacramento Bee article. attached McGinnis

22  Audio &

23  www.sacbee.com/content/news/projects/watchdog/jail/story/13798655p-14632251c.html.

24          115.  It is important to note that then "Captain" Kelley, Commander of the Main

25  Jail Division admits at viewing the main jail video,, and concluded that this application of force

26  on Hay was "appropriate" in light of the body gesture of the deputy symbolizing a beating to take

27  place upon Mr. Hay and the intake nurses warning; this is compounded by the fact that Deputy

28  Ramos testified that he hears popping sounds 60-70% of the time in the application of force.

1   Chief Deputy Babcock was notified of this as well, and ratified his conclusions. (COIA 45)

2   116.  Chief Deputy Babcock reports directly to both the Sheriff and Undersheriff,

3   and is in fact part of the policy making decision process consisting of four Chief Deputies, and

4   sheriff.  For Correction Services, he is given ultimate decision making authority, except

5   supposedly when discipline is imposed.

6   117.  As a comparison, for example, in the last 12 years in the Correctional

7   Services (the same Service Chief Division the Main Jail falls under), not a single manager was

8   ever provided any memos, reports, newsletters nor did they receive any training suggesting the

9   use of force techniques have changed since the 1980s.

10   118.  There has never been a single staff meeting at anytime in the last 20 years

11   that the use of Weaponless Control Self Defense (Koga) techniques have changed, including the

12   "Standing Modified Handcuffing Technique", "The Felony Handcuffing Technique", the "Wrist

13   Lock",  the "Twist Lock", "Wrist Throw", the "Two Count Striking Hand", "Three From the

14   Ring", and the "Carotid Choke."

15   119.  These were the only authorized techniques employed in the Correctional

16   Services Division.

17   120.  Reasonable use of force, almost always involves some escalation, depending

18   upon the circumstances.

19   121.  The Department's reasonable force policy has not changed based upon any

20   court decision.

21   122.  For at least 20 years, officers have been trained to use that force deemed

22   reasonably necessary due to the circumstances at hand, even if the initial force was use of a baton

23   or deadly force.

24   123.  Reasonableness is just the sliding scale on the escalation of force employed,

25   justified by the circumstances which mainly involves the threat of harm to a bystander or the

26   officer.

27   124.  Regardless of the legal terminology, control holds are never to be used as a

28   form of punishment.

125.  Furthermore, control and compliance holds are just that, they are used to control an unruly inmate, and to get them to "comply" with the officers demands – under no circumstances, does reasonableness mean the officer has carte blanch on the use of force to induce injury or pain for pain sake or merely to punish.

126. During the last 12 years, RCCC has had less than 1% of the complaints of excessive force as compared to the main jail.

127.  Also, Plaintiff Afshar lodged with the Court, the Original Deposition Transcript of County of Sacramento Sheriff's Department, and attached to this transcript, and of particular importance to is **Exhibits "2"** (All internal affairs disposition sheets for the main Jail IA investigations from 2000 to 2004) There, numerous deputies have extensive history of excessive complaints in very short periods of time, and that these complaints go unpunished. See for example COIA 341-349.

128.  Another instance, there were approximately 23 complaints of excessive force which went "unfounded", even though video tape evidence was presented showing that excessive force did in fact take place.

129.  There is a difference between "unfounded" and "exonerated".

130.  "Unfounded" simply means that a determination could not be rendered, which in sum, exonerates the Deputy in the presence of contradictory evidence.

131.  "Unfounded" also means the officers statement of the use of force is given complete weight, the complainant's statement is ignored.

132. During the last 10 years, according to Lieutenant Twomey's best recollection not a single inmate was injured during a cell extraction at the Rio Cosumnes Correctional Center Division, whereas numerous inmates have been severely injured in the main jail for the same tactic.

133.  At the Rio Cosumnes Correctional Center, on  Lieutenant Twomey's Watch there were at least 100 prostraint chairings, all with no injuries or complaints, but yet, for the Main Jail, the county paid off hundreds of thousands of dollars for the use of the chair.

134.  At RCCC, there is strong supervisory overwatch, and minimal complaints of

1  excessive force.

2      135. At the Main Jail, there is a complete lack of supervisory over watch, and an

3  inordinate amount of complaints of excessive force.

4      136. Just recently, even when a deputy is fired for excessive force, the

5  Sacramento County District Attorney's office will refuse to prosecute the officer.

6      137. As reported in the Sacramento Bee, the assault followed a verbal

7  disagreement between Sowles and Eley, according to a case summary filed by the prosecution.

8  The summary states that Sowles shoved, slapped and then choked Eley without provocation.

9      138. Two other deputies pulled Sowles from Eley's handcuffed and limp body,

10  while a third deputy watched the incident from an elevated control room, according to the

11  summary.

12      139. The case against Deputy Sowles was dismissed in Superior Court "in the

13  interest of justice," said Deputy District Attorney Don Steed.

14      140. "Mr. Sowles' conduct was troubling, but it was misdemeanor misconduct

15  and the inmate was not injured," Steed said Thursday. "We are assured that he will no longer be a

16  deputy sheriff in Sacramento County. He's a 15-year veteran who has forfeited his career and his

17  pension - those are pretty serious penalties."

18      141. See

19  http://www.sacbee.com/content/news/sacramento/story/14199047p-15025526c.html

20      142. However, had Sowles been convicted of the charge, he would be prohibited

21  from owning a firearm.

22      143. Had this been any other citizen, the case would have been prosecuted, and a

23  citizen's right to own a firearm would be taken away – not if you're a law enforcement officer.

24      144. Law enforcement officers are given every benefit of the doubt in IA

25  investigations, and in prosecutions by the DA's office.

26      145. In essence, the poor, minorities, and those who are not politically connected

27  are becoming more disenfranchised than ever.

28      146. The DA and Sheriff have almost the same identical major campaign

1  contributors.

2      147.  A conviction of Sowles would have lead to extensive county liability, and

3  thus effect the Sheriff's budget.

4      148. The Internal Affairs operational orders and procedures have not substantively

5  changed over the last 20 years.

6      149.  "The Sacramento County Sheriff's Department will investigate *all*

7  complaints against its employees"; that "When the complaint is determined to be a complaint

8  against department policies, procedures, or services provided, the complaint will be referred to

9  the chief deputy of the service involved"; that, "Complaints referred to service chiefs deputies for

10  investigation shall be completed with recommendations and returned to internal affairs by a date

11  specified", and that "Complaints, whether initiated by an outside source or from within the

12  department, shall be investigated, evaluated, a disposition recommended, and if sustained, a

13  proposed notice of disciplined served upon the employee within 90 days from the receipt of the

14  complaint(s).  Matters which are subject to Internal Affairs investigation include criminal

15  conduct, **excessive force**, questions of moral turpitude, matters having the apparent potential for

16  civil litigation, and all other matters as directed by the Undersheriff and/or Sheriff.  All matters

17  which are not investigated at the Internal Affairs level are investigated at the divisional level.

18  Sheriff Department General Order 3/01 & 3/02, **COMPLAINTS AND DISCIPLINARY**

19  **POLICIES AND PROCEDURES**.  This General order has been in effect since approximately

20  1987.

21      150.  The State of California Penal Code, establish written guidelines, and must

22  follow and not deviate from those written guidelines without justification.  Sheriff Department

23  General Order 3/01 & 3/02, **COMPLAINTS AND DISCIPLINARY POLICIES AND**

24  **PROCEDURES**.  If a determination is made that a matter should be investigated at the

25  divisional level, it is given a divisional investigation number.  The matter is then sent through

26  chain of command to the Division Commander for investigation.  The commander can assign a

27  lieutenant to conduct the investigation, who can then assign sergeants to assist in that

28  investigation.  The investigator can conduct interviews and/or request "directed reports."  A

20.

1   directed report is a written response to an order directing a subordinate to document an incident

2   they were involved in or have knowledge of.  Pursuant to the SHERIFF'S DEPARTMENT

3   General Order 3/02, a witness employee does not receive an Administrative Admonishment.

4   When the employee receives the "Notice of Administrative Investigation," the employee, whether

5   a suspect or witness, can declare themselves to be a suspect and be treated in that manner.  This

6   has been in effect since approximately 1987 up to my retirement.

7          151.  Attached to County of Sacramento, Sheriff's Department deposition is

8   **Exhibit "3"**, Citizen Complaint Form filed by Mr. Afshar.  In that form, Mr. Afshar clearly

9   states: ". . . . when I was arrested & taken to **jail**.  I was **attacked by several sheriffs'** and police

10  officers & and they gave me a grizzly beating.  I went into shock at the time & was not sure what

11  was going on.  I have a laceration 2" long on my head . . . ."  ". . . . **police brutality** . . . "

12         152.  To any peace officer POST certified in investigative techniques, they could

13  easily glean from this complaint that Mr. Afshar clearly states that he was beat up by deputies at

14  the main jail, causing a head wound.

15         153.  General Orders at that time required an immediate investigation, and till this

16  day, still requires an investigation.

17         154.  There is no doubt this was an obvious case that required an investigation.

18         155.  In any event, since the Sheriff's department became aware of it, and is

19  currently aware of it, they still have not opened an IA case file against Deputy Spaid, and are

20  allowing a possible rogue officer to continue his employ, and thus creating a danger to society.

21  [Defendants' responses to interrogatories and production of IA cover sheets clearly show that no

22  IA investigation has ever been opened against Deputy Spaid, even after the County acknowledges

23  in a deposition that one should have been initiated.  Under the Departments own general orders,

24  and IA investigation must still be initiated against Deputy Spaid.]

25         156.  This ratification is tantamount to policy, and further supported by public

26  statements made by the Department via the Undersheriff ratifying the use of force in the videos,

27  and further lack of investigation.

28         157.  Deputies brutalize inmates at the Main Jail, use force as a form of

21.

1    punishment, use improper control holds to cause unnecessary pain, falsify the reports, and that

2    management, all the way up to the Chief Deputy, the Undersheriff, and Sheriff are not only aware

3    of this problem, but ratify it.

4          158.  By allowing such actions to continue, deputies are passing along these skills

5    to new hires at the Main Jail, who in turn will brutalize inmates and file false reports because this

6    past conduct has been ratified by the highest level policy makers on the use of force, i.e. the

7    Chief Deputies.

8          159.  Excessive force and the use of proper and improper control holds as a form

9    of punishment is the policy of the department, or more commonly, it's just how things are done -

10   their interpretation on what management allows them to get away with.

11         160.  Policy making officials have ratified unlawful compliance techniques that

12   are used for punishment only.

13         161. Sacramento County Defendants are deliberately indifferent in its policies for

14   investigating citizen complaints regarding excessive force and in disciplining officers for such

15   conduct.

16         162.  Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT has an

17   unwritten policy, custom and practice of the unreasonable application of force at the main jail.

18   Defendant knew that the standard operating procedure to use force first before it is necessary or

19   there is a problem was illegal itself, but Defendant failed to adjust its actions to comply with the

20   law.

21         163.  Defendants are liable because of their ratification, policy and custom of

22   encouraging, tolerating, permitting, and ratifying a pattern of illegal and excessive use of force

23   which was known to them or which should had been known to them, all of which was a custom

24   and/or policy in violation of the United States Constitution and Bill of Rights.

25         164.  The actions alleged above deprived class PLAINTIFFS of the following

26   rights under the United States Constitution: freedom from unlawful search and seizure; freedom

27   from excessive and unreasonable force; freedom from deprivation of liberty without due process

28   of law; and, freedom from summary punishment.

165. Class Plaintiffs are informed and believes prior to Class Plaintiffs being brutalized, Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT permitted, encouraged, tolerated and ratified a pattern and practice of unjustified, unreasonable, and excessive use of force.

166. Class Plaintiffs are informed and believe that Defendants have failed to discipline or prosecute known incidents of excessive force at the main jail.

167. Class Plaintiffs are informed and believe Defendants refused to investigate previous incidents of excessive force after it has been placed on notice by way of a lawsuit or other means, other than the formal citizens complaint process.

168. Class Plaintiffs are informed and believes by means of both inaction and such use of excessive force, Defendants encouraged Officers employed by it to believe that improper use of force was permissible at the main jail.

169. Class Plaintiffs are informed and believe that Defendants have maintained an inadequate system of review for the use of force which the system has failed to identify incidents of improper use of force, or to discipline, more closely supervise, or retrain peace officers who in fact improperly use such force.

170. Class Plaintiffs are informed and believes these systematic deficiencies include, but are not limited to:

    (1)    preparation of investigative reports that are designed to vindicate the use of force,

    (2)    preparation of investigative reports which uncritically rely solely on the word of peace officers involved in the incidents and which systematically fail to credit testimony by non-peace officer witnesses and more importantly video tape evidence of each application of force;

    (3)    preparation of investigative reports which omit factual information and physical evidence which contradicts the accounts of the officers involved;

1    (4)    failure to review investigative reports by responsible superior

2           peace officers for accuracy or completeness; and,

3    (5)    acceptance of conclusions which are unwarranted by the evidence

4           or which contradict such evidence.

5    171.  As a direct and proximate result of the aforesaid acts, omissions, and

6    systematic deficiencies, polices and customs of Defendants, Defendants subjected Class

7    Plaintiffs to excessive force in violation of their constitutional rights.

8    172.  Further facts of the custom and informal written policy of the county which

9    caused plaintiff's 4th Amendment Rights to be violated, incorporated through the 14th, are as

10   follows:

11   (1)    The County knew, actually, and constructively, that force being

12          applied was excessive and failed to remedy it, even though it is

13          caught on video tape and officers testify that approximately 70% of

14          the time, they hear "popping" sounds when applying force.

15   (2)    Take down methods are approved on hard concrete surfaces in the

16          pat down area, especially with individuals too intoxicated to take

17          care of themselves or others, and the county could easily provide

18          padding in these areas where take-downs are frequent.

19   (3)    The county approves the use of force, when objective facts on

20          video show that the force applied was unnecessary as related to the

21          pat-down area of the main jail, and the holding/detox tank.

22   (4)    The county customarily approves force that was/is unreasonable

23          and unjustified.

24   (5)    Defendants give more weight and credibility to the statements of

25          peace officers, over complainants, even with contradictory video

26          evidence.

27   (6)    The county customarily approved force that caused unnecessary

28          harm to detainees, even when employees admit to "popping"

24.

1        sounds being typical with control holds.

2        (7)      Take downs being customary on hard concrete surfaces causing

3                 injury, even when there is no threat of harm to the individual

4                 officer.

5        (8)      Defendants fail to maintain an adequate clean detox area whereas

6                 the toilets are never unclogged, and urine leaks unto the floor

7                 whereby detainees are forced to sit or lay on the urine.

8        (9)      In custody class Plaintiffs are threatened not to express their

9                 concerns of unsanitary conditions in the detox area.

10       (10)     The County fails to find officers using excessive force, even if

11                caught on video tape, and the excessive use of force is obvious.

12       (11)     Across the department, accountability is not adequately stressed,

13                and conflict avoidance is a cultural norm in the department.

14       (12)     There is inadequate documentation on all use-of-force incidents.

15       (13)     The Main Jail accounts for 40 percent of the department's internal

16                affairs investigations.

17       (14)     The Main Jail accounts for over 95% of all excessive force

18                allegations.

19       (15)     The jail has an insufficient number of safety cells and security

20                beds.

21       (16)     Inmate safety is inadequate.

22       (17)     Jail video footage is altered and/or doctored when it shows

23                excessive force.

24       (18)     Deputies are seldom charged with criminal conduct, even when

25                there is a finding of excessive force, and the times when it is

26                referred to the DA's office for prosecution, is when other deputies

27                have given statements against the offending officer.

28       (19)     Based upon information and belief, 99% of all excessive force

1                             cases at the main jail involve young, white male deputies.

2        173.  As such, Plaintiff, and others similarly situated, have been deprived of their

3  Fourth and Fourteenth Amendment right to be free from unreasonable and excessive force, and

4  their First Amendment rights to protest unsanitary and/or unsafe conditions of their confinement.

5        174.  Plaintiffs have been damaged as stated above, and the class as a whole.

6        175.  Plaintiffs requested injunctive relief to remedy the systemic problems of the

7  main jail.

8        176.  Plaintiffs are entitled to Punitive damages as stated above against the Sheriff

9  in his individual capacity.

10

FOURTH CAUSE OF ACTION
(42 U.S.C. § 1983)
(Class Action)
(Selective enforcement and prosecution)

11

12 (Defendants - Defendants COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, in his individual and official capacity;  JAN SCULLY,

13 SACRAMENTO COUNTY DISTRICT ATTORNEY in her individual and official capacity; OFFICE OF THE DISTRICT ATTORNEY COUNTY OF SACRAMENTO; COUNTY OF

14 SACRAMENTO only, ratification, custom, policy and practice establishing Monell liability)

15        177.  Plaintiff incorporates paragraphs 1 through 175 as if though fully set forth

16  herein.

17        178.  In cases investigated by the Sheriff's Department where Deputies are found

18  to have:

19          (1)     used excessive physical force under color of authority as uncovered

20                  in an IA or Divisional investigation (chargeable as a felony or

21                  misdemeanor depending upon the injuries, or whether federal

22                  statute is applied)

23          (2)     committed a battery, assault, or domestic violence off-duty and in

24                  their un-official capacity.

25          (3)     detained and/or arrested for DUI

26          (4)     Defendants COUNTY OF SACRAMENTO, SHERIFF'S

27                  DEPARTMENT and SHERIFF LOU BLANAS, in his individual

28                  and official capacity seldom charge the offending deputies whereas

26.

1    similarly situated Class Plaintiffs are charged with the crimes and

2    the case is then forwarded to the DA's office for prosecution.

3    179. Likewise, in cases investigated by the Sheriff's Department where Deputies

4    are found to have:

5         (1)   used excessive physical force under color of authority as uncovered

6               in an IA or Divisional investigation (chargeable as a felony or

7               misdemeanor depending upon the injuries, or whether federal

8               statute is applied)

9         (2)   committed a battery, assault, or domestic violence off-duty and in

10              their un-official capacity.

11        (3)   detained and/or arrested for DUI,

12        (4)    and Defendants COUNTY OF SACRAMENTO, SHERIFF'S

13              DEPARTMENT and SHERIFF LOU BLANAS, in his individual

14              and official capacity forward the case to the DA's office for

15              prosecution.

16    180. Defendants JAN SCULLY, SACRAMENTO COUNTY DISTRICT

17    ATTORNEY in her individual and official capacity and the OFFICE OF THE DISTRICT

18    ATTORNEY COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO will either

19    severely reduce the charges or dismiss the charges all together so that the offending Deputy's law

20    enforcement career is not jeopardized, such as in the Sowles case.

21    181. In either instance, similarly situated class Plaintiffs are denied equal

22    protection of the law in that they do not receive the same treatment as peace officer employees of

23    the county in that they are charged with the offense, the case is forwarded to the DA's office for

24    prosecution, and class Plaintiffs are prosecuted, without any concern as to whether their careers

25    or occupations may be damaged or destroyed by such criminal conviction.

26    182. For instance, a deputy convicted of a battery cannot posses a firearm.

27    183. A deputy convicted of DUI cannot drive for a given period of time.

28    184. A deputy with a domestic violence restraining order cannot posses a firearm.

27.

185.  In all three situations, Defendants are aware the effect these charges will bring upon the career of the deputies involved, and selectively decide to not charge or prosecute the deputies involved, even though similarly situated non-peace officer arrestees are charged and prosecuted for similar offenses, without any consideration such offenses may have on their livelihood.

186.  In cases investigated by the Sheriff's Department where Deputies are found to have used excessive physical force or committed domestic violence, chargeable as a felony or misdemeanor depending upon the injuries inflicted, or DUIs, and these cases are forwarded to the DA's office for prosecution, and Defendant DA's office takes the Deputy's career into consideration whether to prosecute, and if prosecuted, a reduced charge so that the Deputy's career is not impeded.

187.  A prime example is the case against Sowles that was dismissed in Superior Court "in the interest of justice".

188.  However, by dismissing the case in the "interest of justice", dismissal of criminal charge in interests of justice satisfies requirement that the charges were terminated in a manner indicating SOWLES' innocence.  See *Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. (Cal.) 2004).

189.  "Mr. Sowles' conduct was troubling, but it was misdemeanor misconduct and the inmate was not injured," Steed said Thursday. <u>"We are assured that he will no longer be a deputy sheriff in Sacramento County</u>. He's a 15-year veteran who has forfeited his career and his pension - those are pretty serious penalties."

190.  This statement is false because Sowles committed the excessive use of force under color of law, chargeable as a felony under federal statutes, and the case could have been forwarded to the U.S. Attorney's office for prosecution.

191.  Furthermore, such an agreement does not foreclose Sowles to be hired by any other law enforcement agency.

192.  Since Defendant SOWLES was not convicted of a battery, and unlike the common class citizen, he is still free to purchase and posses firearms at will because a conviction

28.

1   for battery results in a forfeiture of the right to purchase or possess firearms.

2       193.  Keeping in mind that Sowles had previously brandished his firearm at

3   citizens off-duty, as reported by the Sacramento Bee.

4       194.   The same theory for dismissing the criminal case against Sowles, applies

5   equally to most other crimes dismissed against peace officers, such as DUIs and domestic

6   violence cases in particular.

7       195.  In addition, Defendants COUNTY OF SACRAMENTO, SHERIFF'S

8   DEPARTMENT and SHERIFF LOU BLANAS, in his individual and official charge Class

9   Plaintiffs with assault/battery on a peace officer and/or resisting arrest frequently, when the

10  deputies actually were the ones using excessive force.

11      196.  Thus, the victims of excessive force are commonly charged with what is

12  called a "naked 148".

13      197.  Class Plaintiffs have been selectively charged and/or prosecuted because

14  they are not peace officers employed by the county, and peace officers employed by the county

15  are given preferential treatment as to whether they will be charged and/or prosecuted and/or the

16  extent of the charges to be prosecuted on.

17      198.  Based upon information and belief, 99% of all deputies who committed

18  crimes of violence or intoxication were Caucasian AND male.

19      199.  Class Plaintiffs have been damaged according to proof.

20      200.  Class Plaintiffs request injunctive relief as stated herein.

21      201.  Class Plaintiffs request punitive damages against individually named

22  defendants.

23              FIFTH CAUSE OF ACTION
                   (42 U.S.C. § 1985(3))
24                   (Class Action)
            (Conspiracy for Selective enforcement and prosecution)
25      (Defendants - Defendants COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT;
        SHERIFF LOU BLANAS, in his individual and official capacity;  JAN SCULLY,
26      SACRAMENTO COUNTY DISTRICT ATTORNEY in her individual and official capacity;
        OFFICE OF THE DISTRICT ATTORNEY COUNTY OF SACRAMENTO; COUNTY OF
27      SACRAMENTO only, ratification, custom, policy and practice establishing Monell liability)

28      202.  Plaintiff incorporates paragraphs 1 through 200 as if though fully set forth

1   herein.

2          203.   Defendants have conspired against Class Plaintiffs because they have been

3   selectively charged and/or prosecuted because they are not peace officers employed by the

4   county, and peace officers employed by the county are given preferential treatment as to whether

5   they will be charged and/or prosecuted and/or the extent of the charges to be prosecuted on.

6          204. Based upon information and belief, 70% of all Class Plaintiff's selectively

7   charged or prosecuted were not Caucasian AND male.

8          205.  Class Plaintiffs have been damaged according to proof.

9          206.  Class Plaintiffs request injunctive relief as stated herein.

10          207.  Class Plaintiffs request punitive damages against individually named

11   defendants.

12          WHEREFORE, Plaintiff requests this court to:

13          1.  Award class Plaintiffs in excess of $25,000,000.

14          2.  Award compensatory damages against Defendants, and each of them jointly

15   and severally;

16          3.  Award special damages against Defendants, and each of them jointly and

17   severally;

18          4.  Award punitive damages against the individual Defendants in an amount based

19   upon their individual conduct and ability to pay, and to deter future conduct;

20          5.  Award costs of this action, including attorneys' fees; and,

21          6.  Injunctive relief as determined by the court and to remedy the claims in this

22   action, and to include the following as to any other injunctive relief:

23          A)      An order prohibiting further excessive force at the main jail,

24                  including required monitoring by outside consultants to be paid for

25                  by the county, and such appointment shall also include class

26                  counsel and under the supervision of the court, to monitor IA files

27                  and investigations, jail procedures, and reviewing jail video tapes,

28                  and incident reports.

1          B)      All other necessary and proper orders based up the facts of this

2                  case.

3          7.  Award such other and further relief as this Court may deem appropriate.

4

5                                          Respectfully Submitted,
                                           LAW OFFICES OF GARY W. GORSKI
6

DATED:  March 3, 2006                      /s/ Gary W. Gorski
7                                          GARY W. GORSKI,
                                           Attorney for Plaintiff
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28