GARY W. GORSKI
Attorney at Law
8549 Nephi Way
Fair Oaks, CA  95628
Telephone:      (916) 965-6800
Facsimile:      (916) 965-6801
email:      usrugby@pacbell.net
GARY W. GORSKI - CBN:  166526

DANIEL M. KARALASH
1207 Front Street, Suite 15
Sacramento, CA 95814
Telephone:      (916) 787-1234
Facsimile:      (916) 787-0267
email: dmkaralash@surewest.net
DANIEL M. KARALASH - SBN: 176422

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT E. HUNTER, D.V.M., individually, and as class representative for all others similarly situated; HOWARD ELEY individually, and as class representative for all others similarly situated;<br><br>Plaintiff(s),<br><br>vs.<br><br>COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, in his individual and official capacity; COUNTY OF SACRAMENTO; WILLIAM KEVIN SOWLES, in his individual capacity Does 1 through 100;<br><br>Defendant(s). | CASE NO.: 2:06-CV-00457-GEB-PAN<br><br>SECOND AMENDED COMPLAINT FOR:<br><br>1.  42 U.S.C. § 1983 (Excessive force - Plaintiff HUNTER, against unknown Doe Defendant Deputies)<br><br>2.  42 U.S.C. § 1983 (Excessive force - Plaintiff ELEY, against Defendant Sowles)<br><br>CLASS ACTION CAUSES OF ACTION<br><br>3.  42 U.S.C. § 1983 (PLAINTIFFS, individually, and as class representatives - Excessive Force and Suppression of Speech - Ratification, Custom, Policy and Practice - Defendants COUNTY OF SACRAMENTO SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, in his individual and official capacity, and COUNTY OF SACRAMENTO only)<br><br>4.  42 U.S.C. § 1983 (PLAINTIFFS, individually, and as class representatives - Liberty Interest by being denied access to telephone calls - Ratification, Custom, Policy |

1.

and Practice - Defendants COUNTY OF SACRAMENTO SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, in his individual and official capacity, and COUNTY OF SACRAMENTO only)

**DEMAND FOR JURY TRIAL**

**F.R.C.P., Rule 38(a)**

Plaintiff alleges:

INTRODUCTION

1.  Plaintiffs, individually, and as class representatives, by and through their attorneys, GARY W. GORSKI and DANIEL KARALASH, complaining of Defendants jointly and severally and alleges that Defendants violated certain rights guaranteed under the United States Constitution by wrongfully and without just cause injuring Plaintiffs by means of the unjustifiable use of force; in addition, decision making Defendants ratified, implemented and established a custom, policy and practice of unreasonable use of force since at least the 1980s.

2.  All exhibits referenced herein are part of the Court's record in the case of *Afshar v. County*, CASE NO.:  CIV-S-04-1088 LKK JFM and related to Mr. Afshar's Counter-Motion for Summary Judgment.

3.   Plaintiffs complaining of Defendants jointly and severally and allege that Defendants violated certain rights guaranteed under the United States Constitution by refusing to criminally prosecute Peace Officers for excessive force primarily (and even in cases of Driving under the Influence), whereby the common citizen is prosecuted to the full extent of the law for the same or similar type of force being applied to the person of another, or for driving under the influence, or for domestic violence.  Defendants' rationale being that peace officers stand to lose their jobs if convicted of such crimes, and are thus, given preferential treatment.

4.  This complaint is prepared and signed by the attorneys representing Plaintiffs, individually, and as class representatives for others similarly situated and such averments are based upon the information and belief of Plaintiffs with the assistance of counsel.

JURISDICTION

5.  This action is brought pursuant to 42 U.S.C. §1983 and the First, Fourth, Fifth

2.

1    and Fourteenth Amendments to the United States Constitution.  Jurisdiction is founded upon 28

2    U.S.C. §§ 1331 and 1341 and the aforementioned constitutional and statutory provisions.

3                                                        VENUE

4                6.  The unlawful actions alleged herein have taken placed within the jurisdiction

5    of the United States District Court for the Eastern District of California.  Venue is proper under

6    28 U.S.C. § 1391(b).

7                                                        PARTIES

8                7.  Plaintiff, ROBERT HUNTER is and was at all times relevant herein a citizen

9    of the United States of America, a Caucasian 52 year old adult male, and residing Sacramento

10   County, California.

11               8.  Plaintiff graduated from UC Davis in 1975 with a B.S., and his D.V.M. from

12   UC Davis in 1979, and has been a licensed veterinary doctor ever since.

13               9.  But for his arrest for DUI on or about September 17, 2005, he has never been

14   arrested or convicted of any crimes.

15               10.  Plaintiff HOWARD ELEY is and was at all times relevant herein a citizen of

16   the United States of America, an African-American male adult, and residing in Sacramento

17   County, California.

18               11.  Plaintiff HOWARD ELEY is and was at all times relevant herein incarcerated

19   in Defendants Main Jail on or about March 21, 2004.

20               12.  Defendant COUNTY OF SACRAMENTO is an incorporated municipality

21   created under the constitution, laws and statutes of the State of California.  COUNTY OF

22   SACRAMENTO, Sheriff's Department is an agency subject to the control of the COUNTY OF

23   SACRAMENTO.

24               13.  Defendant COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT

25   was and is at all times relevant herein a law enforcement agency which employed duly appointed

26   and acting California Peace Officers.

27               14.  At all times mentioned herein, Defendant COUNTY OF SACRAMENTO, by

28   and through it Sheriff's agency, was acting under color of law, to wit, under color of statutes,

                                                         3.

1  ordinances, regulations, policies, customs, and usages of the State of California and/or the

2  COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT.

3        15.  Defendant COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT has

4  discretion to refer cases of excessive to Defendant DISTRICT ATTORNEY'S OFFICE for

5  prosecution.

6        16.  JAN SCULLY, SACRAMENTO COUNTY DISTRICT ATTORNEY in her

7  individual and official capacity and the OFFICE OF THE DISTRICT ATTORNEY COUNTY

8  OF SACRAMENTO was acting under color of law, in the preferential treatment in the

9  prosecution of peace officers.

10        17.  Unknown Doe Defendants were employed by the COUNTY OF

11  SACRAMENTO, SHERIFF'S DEPARTMENT, and were at all times mentioned herein,

12  Defendants were acting under color of law, to wit, under color of statutes, ordinances,

13  regulations, policies, customs, and usages of the State of California and/or the COUNTY OF

14  SACRAMENTO.

15        18.  At all relevant times, Defendants, and each of them, conspired to create a blue

16  wall of silence and lies to obstruct justice, thus allowing Department officials to condone an

17  environment in which the most violent Deputies believed they would be insulated from

18  prosecution.

19        19.  Defendants were aware that an inordinate amount of Sheriff's Deputies

20  working at the Main Jail commit crimes of violence upon inmates and detainees, but refuse to

21  properly investigate and prosecute said known acts.

22  **CLASS CERTIFICATION**

23        20.  Plaintiff HUNTER is a proper class representative in that (1) the class is so

24  numerous that joinder of all members is impracticable, (2) there are questions of law and fact

25  common to the class, (3) the claims and defenses of the representative parties are typical of the

26  claims and defenses of the class, and (4) the representative parties will fairly and adequately

27  protect the interests of the class.

28        21.  Plaintiff ELEY is a proper class representative in that (1) the class is so

1    numerous that joinder of all members is impracticable, (2) there are questions of law and fact

2    common to the class, (3) the claims and defenses of the representative parties are typical of the

3    claims and defenses of the class, and (4) the representative parties will fairly and adequately

4    protect the interests of the class.

5             22.  Class certification is proper pursuant to F.R.C.P., Rule 23.

6    FIRST CAUSE OF ACTION
(42 U.S.C. §1983)

7    (Excessive Force by unknown Doe Deputies - Plaintiff HUNTER in his individual capacity)

8             23.  PLAINTIFF incorporates paragraphs 1 through 22 as though fully set forth

9    herein at length.

10             24.  On or about September 17, 2005, Plaintiff HUNTER was booked in

11    Defendant Sacramento County Main Jail for suspicion of driving under the influence.

12             25.  The arresting officers stated that Plaintiff Hunter was very cooperative and

13    polite, at the time he was being turned over to the custody of Defendants for their care and

14    control of Plaintiff.

15             26.  While at the Main Jail main detox holding center, Plaintiff HUNTER had to

16    relieve himself, but the detox cell toilet was clogged and overflowing causing unsanitary

17    conditions (a common theme).

18             27.  Plaintiff HUNTER signaled to advise the deputies as to the nature of the

19    problem, and to request access to a toilet to relieve himself.

20             28.  Again, as is typical in the Main Jail detox area, several unknown doe Deputy

21    defendants, for no reason, applied excessive force to the person of Plaintiff causing excessive

22    "popping" sounds emanating from his body, fracturing his elbow, causing nerve damage to his

23    wrist, severe contusions to his legs, tearing and stretching tendons in his extremities, throwing

24    him to the floor, and setting in motion events which forced Plaintiff to fear for his life and safety.

25             29.  Plaintiff was intimidated so much, that he was in fear of his life to request

26    medical treatment and was denied such treatment, even though it was clearly visible that the

27    officers inflicted excessive for upon the person of Plaintiff.

28             30. During the time Plaintiff was being subjected to unreasonable and excessive

5.

force, Defendants, and each of them, ratified the conduct of the other Defendant.

31. At no time was it necessary to use force against Plaintiff.

32. In fact, had force not been used against PLAINTIFF, he would not have suffered serious bodily harm; however, since force was used, PLAINTIFF has now suffered and continues to suffer serious bodily harm and permanent injuries.

33. At the time of PLAINTIFF being brutalized, PLAINTIFF was not violating any laws that justified the use of force, nor was he making any overt threats for the use of force that would place a reasonable officer is fear of his safety.

34. At the time of PLAINTIFF being brutalized and subjected to excessive force, Plaintiff was not attempting to interfere with any peace officers execution of their duties and was not engaged in any assaultive behavior towards DEFENDANTS.

35. The excessive force was entirely unjustified by any action of PLAINTIFF and constituted unreasonable and excessive use of force.

36. The excessive force employed violated Plaintiff's Fourth, Fifth, Eight and/or Fourteenth Amendments to the United States Constitution.

37. The direct and proximate result of DEFENDANTS' acts are that PLAINTIFF has suffered severe and permanent injuries including, but not limited to, a fracture of the arm, severe tissue damage, and was forced to and continues to endure great pain and mental suffering, and to incur medical and legal expenses and was deprived of his physical liberty.

38. PLAINTIFF is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

39. Defendants subjected Plaintiff to such deprivations by either malice or a reckless disregard of Plaintiff's rights.

40. PLAINTIFF is entitled to an award of punitive damages to punish and to deter such conduct.

41. Defendants, under color of state law, subjected Plaintiff to the deprivation of right, privileges, and immunities secured by the Constitution and laws of the United States of America in violation of 42 U.S.C. § 1983.

42.  As a direct and proximate result of Defendants, and each of them, conduct with Plaintiff, Plaintiff has been injured according to proof, including, but not limited to, a broken arm, bruises, concussion, lost wages, lost income, lost benefits, damage to his psyche, shock to nervous system and other damages not yet known.

43. In addition, due to the intentionally inflicted injury, Plaintiff has been damaged.

<u>SECOND CAUSE OF ACTION</u>
(42 U.S.C. §1983)
(Excessive Force by Defendant Deputy William Kevin Sowles - Plaintiff ELEY in his individual capacity)

44.  PLAINTIFF incorporates paragraphs 1 through 43 as though fully set forth herein at length.

45.  On or about March 21, 2004, Plaintiff ELEY was an inmate in Defendant Sacramento County Main Jail.

46. Defendant SOWLES assaulted and battered Plaintiff Howard Eley in a main jail classroom on March 21, 2004.

47.  The excessive use of force followed a verbal disagreement between Sowles and Eley, according to a case summary filed by the Defendant District Attorney's office.

48. The summary specifically states that Sowles shoved, slapped and then choked Eley without provocation.

49.  Two other deputies pulled Sowles from Eley's handcuffed and limp body, while a third deputy watched the incident from an elevated control room, according to the summary.

50. During the time Plaintiff was being subjected to unreasonable and excessive force, Defendant was acting under color of law, and in fact, was following typical Sheriff's Department policy for using control holds as a form of punishment.

51.  At no time was it necessary to use force against Plaintiff.

52.  In fact, had force not been used against PLAINTIFF, he would not have suffered serious bodily harm; however, since force was used, PLAINTIFF has suffered serious bodily harm and injuries to his psyche, including fear of law enforcement.

53.  At the time of PLAINTIFF being brutalized, PLAINTIFF was not violating any laws that justified the use of force, nor was he making any overt threats for the use of force that would place a reasonable officer is fear of his safety.

54.  At the time of PLAINTIFF being brutalized and subjected to excessive force, Plaintiff was not attempting to interfere with any peace officer's execution of their duties and was not engaged in any assaultive behavior toward DEFENDANT.

55.  The excessive force was entirely unjustified by any action of PLAINTIFF and constituted unreasonable and excessive use of force.

56. The excessive force employed violated Plaintiff's Fourth, Fifth, Eight and/or Fourteenth Amendments to the United States Constitution.

57.  PLAINTIFF is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

58.  Defendants subjected Plaintiff to such deprivations by either malice or a reckless disregard of Plaintiff's rights.

59.  PLAINTIFF is entitled to an award of punitive damages to punish and to deter such conduct.

60.  Defendants, under color of state law, subjected Plaintiff to the deprivation of right, privileges, and immunities secured by the Constitution and laws of the United States of America in violation of 42 U.S.C. § 1983.

61.  As a direct and proximate result of Defendant's conduct with Plaintiff, Plaintiff has been injured according to proof.

<u>THIRD CAUSE OF ACTION</u>
(42 U.S.C. § 1983)
(Class Action)
(Defendants - COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, individually and in his official capacity, ratification, custom, policy and practice establishing *Monell* liability)

62.  Plaintiff incorporates paragraphs 1 through 61 as if though fully set forth herein.

63.  Defendant Blanas has ratified the above and below averments in this complaint.

64. Defendants use recruitment videos which show nothing but action adventure, such as what may be found in a military recruitment video used to enlist only men into special ops, infantry units, and Marine combat units.

65. Defendants recruitment videos are used to lure gung-ho (As Defined in the Oxford Dictionary:  unthinkingly enthusiastic and eager, especially about taking part in fighting or warfare. -ORIGIN from a Chinese word taken to mean "work together" and adopted as a slogan by US Marines.) recruits with dreams of shooting bad guys and fighting terrorists, jumping from helicopters, using expensive hi-tech weaponry, using flash bangs, hi speed pursuits, and so forth.

66. In essence, Defendants recruitment technique is to lure the most violent and/or gung-ho males to work in the main jail.

67. Then, the training academy is no different with the gung-ho training attitude.

68. After all the bombardment of brainwashing for a gung-ho career of kicking-butt, young Deputies are assigned the most menial, disliked task in the entire department - employment at the main jail, especially at booking and detox.

69. However, the more experienced and mature deputies and management are not assigned to the main jail, and in essence, leaving gung-ho violent prone deputies to take out their aptitude for violence on those who are unable to take care of themselves or others, or other minor offenders who are not a danger whereby they can all be grouped together as they are not a threat in to the deputies or each other in a group setting.

70. The Detox area is isolated from the dangerous criminals (i.e. those who are known to be a real threat to both deputies and other detainees.)

71. Class Plaintiffs incarcerated in the detox area, especially for 647(f) P.C. (Too intoxicated to take of themselves) or for DUI, are especially attacked by deputies since the gung-ho young deputies have a very low threshold of tolerance for dealing with intoxicated individuals, such as their inability to follow instructions.

72. This is partially due to the fact of the gung-ho deputies age and maturity level, but also because they have been brainwashed into believing what recruiters said and displayed,

9.

1   and the mentality of the academy itself as being military in nature.

2        73.   Deputies recruited for main jail duty easily take out their frustration and just

3   pummel intoxicated class Plaintiffs since they have been recruited and trained to act gung-ho.

4        74.   Because of this, this class of Plaintiffs are especially subjected to abuse by

5   Deputies, even when arresting officers (typically CHP or City Police) had no problem with the

6   class plaintiffs at the time of their arrest.

7        75.   Moreover, assignment to the Main Jail and RCCC are used as punishment for

8   either those who stand up against management for improper tactics, whistleblowing or the like,

9   or those deputies who are substandard in patrol.

10        76.   In addition, newly promoted Sergeants and management officers are assigned

11   to correctional services as well (in other words, the least experienced managers are assigned to

12   supervise the least experienced gung-ho deputies, or problem deputies), <u>especially those deputies</u>

13   <u>with a poor performance history or who have had an inordinate amount of complaints lodged</u>

14   <u>against them.</u>

15        77.   Class Plaintiffs include those held in detox, booking process until releases,

16   failure to make bail while awaiting trial, or those convicted and sentenced to jail or awaiting

17   transfer to state prison.

18        78.   Class plaintiffs also include those subjected to the unnecessary use of

19   tazers/tasers, flash bangs, batons, and other deadly/dangerous instruments.

20        79.   Class plaintiffs also include those subjected to plain old fashion beatings by

21   multiple deputies on a single incarcerated class Plaintiff.

22        80.   Class plaintiffs also include those subjected to beatings by a single deputy.

23        81.   Complaints of excessive force at the Main Jail, and entity Defendants being

24   placed on such notice, date back to the 1980s.

25        82.   While assigned to the old main jail, a Lt. Twomey (now retired) authored a

26   chronicle of events and devoted a whole chapter describing a true factual account regarding the

27   complete lack of management control at all levels at the Main Jail facility.

28        83.   In particular, Lt. Twomey chronicled how a Deputy Kelley's Morning Watch

10.

1   (the same Sgt., Captain, and now Chief Kelley of the Main Jail at issue in this case and during

2   the time of related case Mr. Afshar's injuries there) had amassed more complaints of brutality in

3   30 days, then the entire patrol division over the entire year.  Page 37 of the published report.

4         84.  Lieutenant Twomey gave this manuscript to then Sheriff Robbie Waters, the

5   Chief Deputy of Security and Correctional Services, Gil Baker,  Main Jail Commander Braxton

6   W. Bonner, and to high ranking management officials in Sheriff's staff services (e.g., then

7   Lieutenant Jon Benbow).

8         85.  Interesting, the then Deputy Bill Kelley, was promoted to Captain and

9   assigned to the Main Jail at the time of the Afshar beating, and is now Chief Deputy of

10   Correctional Services.

11         86.  Hence, since this publication, Sacramento County Sheriff's Department was

12   placed on notice of the pattern of excessive force in correctional services, and in particular, at the

13   Main Jail (old and new).

14         87.  This fact has remained constant, and in particular, under the watch of Kelley.

15         88.  For instance, not only did the Sacramento Bee published a preliminary audit

16   of the Main Jail which was produced by Defendant COUNTY, the actual audit itself has now

17   been made part of public record on the COUNTY's own website, which shows

18         (1)   Across the department, accountability is not adequately stressed,

19               and conflict avoidance "appears to be a cultural norm" in the

20               department.

21         (2)   Internal Affairs:  There is inadequate documentation on all

22               use-of-force incidents.

23         (3)   Internal Affairs:  The Main Jail accounts for 40 percent of the

24               department's internal affairs investigations.

25         (4)   The jail has an insufficient number of safety cells and security

26               beds.

27         (5)   Public and staff alike are concerned about inmate suicides and

28               safety.

1        89. Even though the Audit was critical of Defendants, the Auditors were

2    specifically paid an additional $200,000 to address issues of excessive force at the main jail.

3        90.  The auditors failed to even follow their contracted obligations, and

4    Defendants Sheriff's Department, County and Blanas individually and in his official capacity,

5    failed to address the auditors failures, but instead accepted the auditors findings though

6    incomplete per the scope of work that was to be performed under the contract.

7        91.  The auditors were paid over a half a million dollars ($592,738), though

8    initially they were contracted for $386,000.

9        92.  The $200,000 increase was due to the current excessive force complaints.

10        93.  The auditors were contracted to look at key evidence to be review such as

11   film footage, but yet none of the excessive force videos were reviewed.  Instead, the Auditors

12   only commented on the technology employed, and failed (or refused) to review objective

13   evidence of excessive force.

14        94.  One  of "primary objective[s]" (if not the single) of the audit was the "use of

15   force" and "the contacting and following up on allegations made at the public hearing" including

16   the contact of "plaintiffs' attorneys".

17        95.  None of the Plaintiffs' attorneys on the excessive force cases were contacted

18   and none of the evidence was reviewed.

19        96.  So, after paying an extra $200,000 to address these issues, the auditors state

20   this in the audit at page 28 (keeping in mind the Mike Hay case was settled -- and no discipline

21   was issued for excessive force in that case with plenty of video to be reviewed):

22           (1)     "Some possible opportunities for staff to study and develop their
                      own recommendations might include (but should not be limited to)
23                    the following:"
                      (a)     "An on-going review of all claims filed against the
24                            Department involving the jail operations and disseminating
                              that information among managers and supervisors.  This
25                            would heighten attention to trends and patterns in facilities,
                              on shifts, in certain commands, etc."
26                    (b)     "The consultants made a conscious decision not to analyze
                              or comment on open or pending cases during this review as
27                            it would be inappropriate for us to draw any conclusion or
                              make a judgment on a specific case that could potentially
28                            affect settlement discussions or be used in a future court
                              proceeding."

12.

97. Defendant Sheriff Blanas has given through custom, practice, ratification and usage, the Chief Deputies ultimate decision making authority in determining whether use of force is appropriate.

98. Defendant Blanas, individually and as official policy maker, either reviews obvious excessive force on video tape, and sanctions its use by failing to take corrective action, or knowingly accepts false statements and reports in an attempt to conceal excessive force or cruel and unusual punishment at the main jail.

99. In the alternative, Blanas in his individual capacity acquiesced in the constitutional deprivations of Plaintiffs' constitutional rights to be free from excessive force and cruel and unusual punishment, and/or has clear and obvious notice of such deprivations that till this day, Blanas' conduct has showed a reckless or callous indifference to the rights of all arrestees and those incarcerated, including Plaintiffs individually and as class representatives.

100. Defendant Blanas has ratified an unwritten policy of excessive force and cruel and unusual punishment violating the constitutional rights of each arrestee, detainee, those incarcerated, and Plaintiffs.

101. Defendants, and Blanas individually as well, have deliberately violated the constitutional rights of each and every person who has been arrested, detained and incarcerated at the main jail.

102. There has never been a single staff meeting at anytime in the last 20 years that the use of Weaponless Control Self Defense (Koga) techniques have changed, including the "Standing Modified Handcuffing Technique", "The Felony Handcuffing Technique", the "Wrist Lock",  the "Twist Lock", "Wrist Throw", the "Two Count Striking Hand", "Three From the Ring", and the "Carotid Choke."

103. These were the only authorized techniques employed in the Correctional Services Division; however, Defendants, including Blanas in his individual capacity, allowed unauthorized techniques to be deployed and/or use authorized and unauthorized techniques to be deployed as a form of punishment to cause excessive pain which would be unreasonable under the circumstances.

13.

104. Reasonable use of force, almost always involves some escalation, depending upon the circumstances.

105. The Department's reasonable force policy has not changed based upon any court decision.

106. For at least 20 years, officers have been trained to use that force deemed reasonably necessary due to the circumstances at hand, even if the initial force was use of a baton or deadly force.

107. As reported in the Sacramento Bee, the assault on Plaintiff Eley followed a verbal disagreement between Sowles and Eley, according to a case summary filed by the prosecution. The summary states that Sowles shoved, slapped and then choked Eley without provocation.

108. Two other deputies pulled Sowles from Eley's handcuffed and limp body, while a third deputy watched the incident from an elevated control room, according to the summary.

109. The case against Deputy Sowles was dismissed in Superior Court "in the interest of justice," said Deputy District Attorney Don Steed.

110. Deputies brutalize inmates at the Main Jail, use force as a form of punishment, use improper control holds to cause unnecessary pain, falsify the reports, and that management, all the way up to the Chief Deputy, the Undersheriff, and Sheriff are not only aware of this problem, but ratify it.

111. By allowing such actions to continue, deputies are passing along these skills to new hires at the Main Jail, who in turn will brutalize inmates and file false reports because this past conduct has been ratified by the highest level policy makers on the use of force, i.e. the Chief Deputies.

112. Excessive force and the use of proper and improper control holds as a form of punishment is the policy of the department, or more commonly, it's just how things are done - their interpretation on what management allows them to get away with.

113. Furthermore, the only time an officer is arrested for excessive use of force is

14.

1    when other Deputies are willing to testify against the officer, otherwise, IA never arrests an

2    officer for the illegal application of force.

3              114.  Blanas and policy making officials have ratified unlawful compliance

4    techniques that are used for punishment only.

5              115. Sacramento County Defendants and Blanas are deliberately indifferent in its

6    policies for investigating citizen complaints regarding excessive force and in disciplining officers

7    for such conduct.

8              116.  The Sheriff's Department and Blanas fails to provide the District Attorney

9    with information it was authorized by law to receive, variously refusing to supply information,

10   delaying information, or employing practices that otherwise hindered the investigation of

11   excessive force.

12             117.  Attached hereto, and incorporated herein as though fully set forth at length is

13   the Sacramento County DA's June 7, 2006 use of force memo addressed to Assistant Sheriff

14   David Lind, Sacramento County Sheriff's Office, 711 G Street, Sacramento, CA 95814, Re: Use

15   of Force – Investigation and Findings, Sacramento Sheriff's Department # 05-91690, Incident of

16   December 1, 2005 at Main Jail.

17             118. Per the DA's memo dated June 7, 2006, attached hereto and incorporated

18   herein, even the District Attorney's office had problems with Defendants cooperation in

19   investigating excessive force complaints: "In particular, the practice of ordering all sworn

20   officers (even those who were neither targets nor criminal suspects) to give statements with the

21   promise of criminal immunity (the Lybarger procedure discussed in greater detail below), then

22   refusing at one point to turn such statements over to our office, hampered our ability to obtain

23   information from all relevant witnesses and to conduct a thorough independent investigation."

24             119.  Defendant Sheriff's Department and Defendant Blanas (individually and in

25   his official capacity) has granted immunity from prosecution to all Deputies that give statements

26   to internal affairs in cases of excessive force, even though they are the ones that employed the

27   excessive force causing the harm.

28             120.  Defendant Blanas has created a system of immunity to officers who use

15.

1   excessive force or inflict cruel and unusual punishment, thus setting a standard by which officers

2   know they will go unpunished for the improper use of force.

3          121.   Defendant Blanas has intentionally attempted to conceal known incidents of

4   excessive force, and has deliberately failed to correct incidents of excessive force, though made

5   known to him through his upper management, subordinates, Sacramento Bee, and his attorneys.

6          122.   Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT and

7   Defendant Blanas has an unwritten policy, custom and practice of the unreasonable application of

8   force at the main jail.

9          123.   Defendants and Blanas knew that the standard operating procedure to use

10   force first before it is necessary or there is a problem was illegal itself, but Defendant failed to

11   adjust its actions to comply with the law.

12          124.   Defendant COUNTY has failed to take corrective measures in light of such

13   overwhelming evidence of excessive force at the Main Jail, that it is tantamount to county wide

14   policy, and not just systemic to the Sheriff's Department or Blanas individually.

15          125.   Defendants are liable because of their ratification, policy and custom of

16   encouraging, tolerating, permitting, and ratifying a pattern of illegal and excessive use of force

17   which was known to them or which should had been known to them, all of which was a custom

18   and/or policy in violation of the United States Constitution and Bill of Rights.

19          126.   Because of the above custom, policy, practice and ratification of the

20   excessive use of force, Plaintiffs Hunter and Eley have been injured, damaged, and deprived of

21   their constitution rights to be free from unreasonable or excessive use of force.

22          127.   Blanas has ratified the excessive use of force, causing damage not only to

23   Plaintiffs, but to other similarly situated Plaintiffs at the Main Jail as well.

24          128.   The actions alleged above deprived class PLAINTIFFS of the following

25   rights under the United States Constitution: freedom from unlawful search and seizure; freedom

26   from excessive and unreasonable force; freedom from deprivation of liberty without due process

27   of law; and, freedom from summary punishment.

28          129.   Class Plaintiffs are informed and believes prior to Class Plaintiffs being

1   brutalized, Defendant SACRAMENTO COUNTY SHERIFF'S DEPARTMENT permitted,

2   encouraged, tolerated and ratified a pattern and practice of unjustified, unreasonable, and

3   excessive use of force.

4          130.  Class Plaintiffs are informed and believe that Defendants have failed to

5   discipline or prosecute known incidents of excessive force at the main jail, unless reported by co-

6   workers of the offending officer.

7          131.  Class Plaintiffs are informed and believe Defendants refused to investigate

8   previous incidents of excessive force after it has been placed on notice by way of a lawsuit or

9   other means, other than the formal citizens complaint process, unless reported by co-workers of

10  the offending officer.

11         132.  Class Plaintiffs are informed and believes by means of both inaction and

12  such use of excessive force, Defendants encouraged Officers employed by it to believe that

13  improper use of force was permissible at the main jail.

14         133.  Class Plaintiffs are informed and believe that Defendants have maintained

15  an inadequate system of review for the use of force which the system has failed to identify

16  incidents of improper use of force, or to discipline, more closely supervise, or retrain peace

17  officers who in fact improperly use such force.

18         134.  Class Plaintiffs are informed and believes these systematic deficiencies that

19  are ratified by Blanas in his individual capacity and the Sheriff's Department include, but are not

20  limited to:

21              (1)     preparation of investigative reports that are designed to vindicate

22                      the use of force,

23              (2)     preparation of investigative reports which uncritically rely solely

24                      on the word of peace officers involved in the incidents and which

25                      systematically fail to credit testimony by non-peace officer

26                      witnesses and more importantly video tape evidence of each

27                      application of force;

28              (3)     preparation of investigative reports which omit factual information

17.

1                 and physical evidence which contradicts the accounts of the

2                 officers involved;

3       (4)    failure to review investigative reports by responsible superior

4                 peace officers for accuracy or completeness; and,

5       (5)    acceptance of conclusions which are unwarranted by the evidence

6                 or which contradict such evidence.

7       (6)    preparation of audits that deliberately fail to investigate known

8                 incidents of excessive force, even when the auditors are

9                 specifically contracted to address such issues.

10      (7)    Failure to review known video tapes of excessive force, or in the

11               alternative, if reviewed, condoning such use of excessive force

12               depicted in the video tape and failing to take corrective action.

13      (8)    Defendant Blanas also sometimes refuses to review video taped

14               excessive force, and creates blind acquiescence to its use.

15      (9)    failure to cooperate with the district attorney's office in criminal

16               investigations of deputies for the use of excessive force, and

17               Defendant Blanas' failure to punish his subordinates for failing to

18               cooperate with criminal investigations of peace officers involved in

19               excessive force or cruel and unusual punishment.

20      135.  As a direct and proximate result of the aforesaid acts, omissions, and

21 systematic deficiencies, polices and customs of Defendants, Defendants subjected Class

22 Plaintiffs to excessive force and cruel and unusual punishment in violation of their constitutional

23 rights.

24      136.  As a direct and proximate result of the aforesaid acts, omissions, and

25 systematic deficiencies, ratification, polices and customs of Blanas, Blanas subjected Plaintiffs

26 and Class Plaintiffs to excessive force and cruel and unusual punishment in violation of their

27 constitutional rights.

28      137. The excessive force and cruel and unusual punishment employed violated

named Plaintiffs and class Plaintiffs, Fourth, Fifth, Eight Amendment and/or Fourteenth Amendments to the United States Constitution.

138. Further facts of the custom and informal written policy of the county which caused plaintiffs' Fourth, Fifth, Eight Amendment Rights to be violated, incorporated through the Fourteenth, are as follows:

(1) The County knew actually and constructively that force being applied was excessive, cruel and unusual and failed to remedy it, even though it is caught on video tape and officers testify that approximately 70% of the time, they hear "popping" sounds when applying force.

(2) Take down methods are approved on hard concrete surfaces in the pat down area, especially with individuals too intoxicated to take care of themselves or others, and the county could easily provide padding in these areas where take-downs are frequent.

(3) The county approves the use of force, when objective facts on video show that the force applied was unnecessary as related to the pat-down area of the main jail, and the holding/detox tank.

(4) The county customarily approves force that was/is unreasonable and unjustified.

(5) The county customarily approved force that caused unnecessary harm to detainees, even when employees admit to "popping" sounds being typical with control holds.

(6) The county specifically and intentionally failed to address the issue of why the main jail auditors refused to address issues of excessive force and to review such evidence of excessive force, thus refusing to take adequate measures to address issues of excessive force at the main jail.

139. As such, Plaintiff, and others similarly situated, have been deprived of their

Fourth and Fourteenth Amendment right to be free from unreasonable and excessive force, and their First Amendment rights to protest unsanitary and/or unsafe conditions of their confinement.

140.  Plaintiffs have been damaged as stated above, and the class as a whole.

141.  Plaintiffs requested injunctive relief to remedy the systemic problems of the main jail.

142.  Plaintiffs are entitled to Punitive damages as stated above against the Sheriff in his individual capacity.

143.  As a direct and proximate result of Defendant's conduct with Plaintiff, Plaintiff has been injured according to proof, including the violation of their consititutional rights, including, but not limited to, Fourth, Fifth, Eight Amendment Rights incorporated through the Fourteenth Amendment.

144.  Plaintiffs Hunter, Eley and Class plaintiffs have been damaged according to proof for being denied these very important constitutional right.

145.  Plaintiff Hunter, Eley and Class Plaintiffs request injunctive relief as stated herein.

146.  Plaintiff Hunter, Eley and Class Plaintiffs request punitive damages against individually named defendant Blanas, Sowles and future named doe defendants.

FOURTH CAUSE OF ACTION
(42 U.S.C. § 1983)
(Class Action)

(Defendants - COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; SHERIFF LOU BLANAS, individually and in his official capacity, ratification, custom, policy and practice establishing *Monell* liability)

147.  Plaintiff incorporates paragraphs 1 through 146 as if though fully set forth herein.

148.  While Plaintiff Hunter was incarcerated, he was denied access to a telephone for approximately 18 hours.

149.  For that 18 hours, Plaintiff Hunter could not contact any family member or relative, or to advise any family member or relative of his whereabouts.

150.  This was very stressful to Plaintiff Hunter, and his family as where since they were concerned about his whereabouts.

20.

151.  Plaintiff Hunter was denied access to an attorney and bail bondsman as well, all in violation of the statute.

152.  Plaintiff Hunter was damaged by the deprivation of this very important constitutional right.

153.  Instead, Plaintiff Hunter's entire experience at the Main Jail was one of fear and coercion to remain silent, even to address parental and medical needs.

154.  Class Plaintiffs are those booked at the main jail, and denied access to a telephone within three hours after arrest or immediately after booking.

155.  Defendant Blanas, in his individual capacity, knew, or should have known, that arrestees are deprived of their right to make three phone calls, but instead, ratified and/or instituted a policy of non-compliance with arrestees liberty interests.

156.  The failure to allow arrestees to make their liberty interest phone calls was an intentional and deliberate act by Blanas' policy for the Main Jail.

157.  In the alternative, Blanas in his individual capacity acquiesced in the constitutional deprivations of Plaintiffs' liberty interest, and/or has clear and obvious notice of such deprivations that till this day, Blanas' conduct has showed a reckless or callous indifference to the rights of all arrestees, including Plaintiffs individually and as class representatives.

158.  Defendant Blanas has ratified a policy of violating the liberty interest of each arrestee and Plaintiff.

159.  Defendants, and Blanas individually as well, have deliberately violated the "liberty interest" of each and every person who has been arrested and was not allowed to make a phone call no later than three hours after arrest because either the phone was in-operative or those who have asked to make a phone call were either summarily beaten or verbally threatened and told to shut-up.

160.  Furthermore, detainees are never advised of their right to make a phone call and/or lied to and told they are not entitled one, which said conduct has been ratified by Blanas as well.

161.  In either instance, Class Plaintiffs' liberty interest rights have been violated.

162.  Under California state law, arrestees are entitled to make three completed telephone calls "immediately upon being booked" or "no later than three hours after arrest":  one to an attorney, one to a bail bonds person, and one to a relative or other person.  Cal.Penal Code § 851.5.

163.  These phone calls are supposed to be free when made within the local dialing area.

164.  The right secured by  Cal.Penal Code § 851.5. gives rise to a liberty interest protected by the Fourteenth Amendment's Due Process Clause.  *Carlo v. City of Chino*, 105 F.3d 493, 497 (9th Cir.1997).

165.  The Sheriff's Department and Defendant Blanas in his individual capacity has deliberately violated thousands of detainees right to make these three calls in that the phone in the detox cell never works or is deliberately turned off.

166.  When detainees ask to use the phone while in detox, they are summarily beaten or threatened with use of force while being told to shut-up.

167.  When and if a phone does become available some 10-20 hours after booking, it is a single phone, whereby numerous detainees are lined up waiting to make calls, and only few have the opportunity then to make the call.

168.  Because of limited telephones, detainees seldom get the opportunity to make a call before their release.

169.  Plaintiff Hunter and Class plaintiffs have been damaged according to proof for being denied this very important liberty interest.

170.  Plaintiff Hunter and Class Plaintiffs have been damaged according to proof.

171.  Plaintiff Hunter and Class Plaintiffs request injunctive relief as stated herein.

172.  Plaintiff Hunter and Class Plaintiffs request punitive damages against individually named defendant Blanas, and future named doe defendants.

WHEREFORE, Plaintiff requests this court to:

1.  Award class Plaintiffs in excess of $25,000,000.

2.  Award compensatory damages against Defendants, and each of them jointly

1    and severally;

2           3.  Award special damages against Defendants, and each of them jointly and

3    severally;

4           4.  Award punitive damages against the individual Defendants in an amount based

5    upon their individual conduct and ability to pay, and to deter future conduct;

6           5.  Award costs of this action, including attorneys' fees; and,

7           6.  Injunctive relief as determined by the court and to remedy the claims in this

8    action, and to include the following as to any other injunctive relief:

9           A)   An order prohibiting further excessive force at the main jail,

10                 including required monitoring by outside consultants to be paid for

11                 by the county, and such appointment shall also include class

12                 counsel and under the supervision of the court, to monitor IA files

13                 and investigations, jail procedures, and reviewing jail video tapes,

14                 and incident reports.

15          B)   An order mandating that detainees immediately be given access to

16                 a working telephone within three hours after arrest, or immediately

17                 after being booked, and that an adequate number of working

18                 telephones be available (i.e. which will prevent excessive waiting

19                 in line, thus precluding access because there are not enough phones

20                 to handle the volume.)

21          C)   An order prohibiting the use of false and misleading recruitment

22                 tools/communications to lure recruits who would have a propensity

23                 for violence or aggressive behavior.

24          D)   An order mandating that recruits are advised of the mundane work

25                 experience at the main jail, and that they must have the ability to

26                 refrain from using violence.

27          E)   All other necessary and proper orders based up the facts of this

28                 case, which would preclude the violation of Class Plaintiffs' civil

23.

1    rights.

2         7.  Award such other and further relief as this Court may deem appropriate.

3                                   Respectfully Submitted,
                                   LAW OFFICES OF GARY W. GORSKI

4    DATED:  August 22, 2006          /s/ Gary W. Gorski
5                                   GARY W. GORSKI,
                                   Attorney for Plaintiffs
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



OFFICE OF THE

# DISTRICT ATTORNEY

SACRAMENTO COUNTY

**JAN SCULLY**
DISTRICT ATTORNEY

**CYNTHIA G. BESEMER**
CHIEF DEPUTY

June 7, 2006

Assistant Sheriff David Lind
Sacramento County Sheriff's Office
711  G  Street
Sacramento, CA 95814

Re:    Use of Force – Investigation and Findings
       Sacramento Sheriff's Department # 05-91690
       Incident of December 1, 2005 at Main Jail

Dear Assistant Sheriff Lind:

This report addresses our investigation and review of actions of deputies assigned to the Main
Jail on December 1, 2005, to determine if criminal charges are warranted.  These actions
followed a disturbance by several inmates who flooded their cells.  We have found:

- Once compiled and reviewed, the evidence is not sufficient to warrant criminal
  prosecution of any of the deputies involved for violations of Penal Code sections 147
  (inhumane treatment of a prisoner), 149 (assault by an officer), 673 (corporal punishment
  of a prisoner), or any other crime.  Factors which contributed to our conclusion in
  evaluating the culpability of the deputies included inadequate administrative supervision
  of Sheriff's staff in the jail, and language of certain Sheriff's operating orders.

- At different points the Sheriff's Department failed to provide the District Attorney with
  information we were authorized by law to receive, variously refusing to supply
  information, delaying information, or employing practices that otherwise hindered the
  investigation.  In particular, the practice of ordering all sworn officers (even those who
  were neither targets nor criminal suspects) to give statements with the promise of
  criminal immunity (the <u>Lybarger</u> procedure discussed in greater detail below), then
  refusing at one point to turn such statements over to our office, hampered our ability to
  obtain information from all relevant witnesses and to conduct a thorough independent
  investigation.

## I.  REVIEW PROCESS

The District Attorney's Office conducted its investigation and review as an independent agency. Our investigation included the interview of witnesses, and the review of written reports and other documentary items, including: Sheriff's casualty reports, jail incident reports (PF10 computer screen reports) and supplemental reports; video recording of the cell extractions; photographs; interviews of inmates, and Sheriff's personnel; District Attorney investigative reports and supplements, diagrams and logs; Sheriff's Office personnel files; Sheriff's Department Operations Orders; inmate incident reports; documentation on the technical data of flash-bang tactical grenades; Sheriff's diversionary devices training information; and legal authorities relating to the use of force by law enforcement officials in a custodial setting.  In reviewing the materials, internal inconsistencies contained in the witnesses' statements and discrepancies between various witnesses' statements were considered. We also considered what each witness was able to see, hear or otherwise perceive as established by the audio/visual record. The criminal histories of the involved inmates were also reviewed to evaluate credibility.

We considered Sheriff's Department policies and procedures as they related to the "use of force" tactics employed by deputies on December 1, 2005.  We do not address issues of civil liability.

## II.  FACTUAL SUMMARY

In the Main Jail, 400 pod (located on 8 Floor West) is used to house inmates who are particularly dangerous or disruptive.  The area has cells on both an upper and a lower tier.  On December 1, 2006, shortly after 7:30 p.m., deputies noticed water flowing over the upper tier walkway and draining onto the main floor of the pod as a result of cell flooding.  [Cell flooding occurs when inmates leave the water running after plugging the toilet and sink drains in their cells and is not an uncommon occurrence in the jail].  Deputies shut off the water to the offending cells, and put magnetic covers over the cell door windows.  The inmates began yelling and kicking their cell doors.

Five inmates on the upper tier were determined to be responsible.  Three were being held on murder charges, one was pending multiple robbery counts, and one was pending drug charges. The acting Watch Commander, Sgt. Donald Black, directed that a Custody Emergency Response Team (CERT) be used to extract the inmates from their cells.  Following assembly and briefing, the team arrived at 8 Floor West shortly before 8:30 p.m.  Sgt. Black personally led and directed the extractions.  One cell at a time, each inmate was directed to lie down on the floor of his cell. In a matter of seconds, the feeding port was then opened and a flash-bang grenade (designed to briefly stun and disorient, but not to cause injury) was inserted into the cell.  After the flash-bang went off, each cell was opened and a team entered, physically subdued the inmate, and took him to the lower level.  The inmates were not afforded an opportunity to submit to handcuffing through the food port nor to voluntarily leave their cells.  Ultimately, the five inmates on the upper tier, and one inmate on the lower tier who began yelling and inciting others, were subjected to this procedure.  After the extraction, each inmate was placed in a prostraint chair for a period of time, then relocated to a different cell.  The extraction process was video recorded for the first five extractions but, due to battery failure, the sixth extraction was not video recorded.

Three inmates suffered only minor bruising or "complaint of pain" type injuries.  Inmate Michael Toro suffered a chin laceration and a fractured nose.  Inmate Jason Morrison suffered flesh burns to his upper left chest and arm.  Inmate Daniel Lucas suffered burns to his upper inner thighs.  In addition, inmate Jessie Kerwin had powder burns on his pants near the right hip and upper thigh.  The burn or powder burn evidence on the persons or clothing of Morrison, Lucas and Kerwin, taken together with other evidence, indicates each was lying on the floor as directed when the flash-bang ignited.

Because the case involves six separate extractions with six individual inmates, each with some discrete elements, a full factual description is complex.  The factual chronologies, differing versions, and various injuries suffered are given more detailed treatment in Attachments A, B, C and D.

## III.  INVESTIGATION HISTORY: CONTACTS WITH SHERIFF'S OFFICIALS

Ordinarily we do not comment on the cooperation of other agencies.  In this instance, however, the circumstances surrounding the referral of this matter to our office by the Sheriff, and the subsequent conduct and responsiveness of the Sheriff's Department to our investigation, significantly impacted our ability to discover and evaluate the facts of this case.

On the afternoon of Tuesday, December 6, 2005, this matter was brought to our attention for the first time.  Assistant Sheriff David Lind and Captain Glenn Powell met with Assistant Chief Deputy District Attorney Albert Locher seeking an evaluation of the use of force by officers in an incident which had occurred the previous Thursday evening at the main jail. They presented a brief verbal description and showed Mr. Locher a computer video file of cell extractions, which involved the use of flash-bang grenades to extract recalcitrant inmates from cells on December 1, 2005.  No written reports were provided. Mr. Locher made a copy of the video file on his computer.  The video file was forwarded to the District Attorney's Special Investigations Unit, which conducts peace officer defendant investigations and prosecutions.

On December 7, the Sheriff's Department publicly released details of the incident.  On December 8, the Sheriff's Department issued a formal press release about the incident, which concluded with the statement, "The matter has been referred to the District Attorneys Office for review."

During the month of December, the Sheriff's Department provided limited information to the Special Investigations Unit, i.e. basic inmate casualty/injury reports and some fundamental information on flash-bangs.

On January 12, 2006, Don Cox, an investigator from the District Attorney's office, contacted Sgt. Coffman of the Sheriff's Internal Affairs Division requesting additional information, including statements by Sheriff's jail personnel, regarding the December 1 incident. Sgt. Coffman advised Cox that he could not provide any statements of sworn personnel who were interviewed as part of the Internal Affairs investigation because the statements were compelled under the threat of disciplinary action. According to Sgt. Coffman, and as confirmed by Captain

Powell, an agreement between the Sheriff's Department and the Deputy Sheriff's Association (DSA) states that all statements taken from sworn personnel during the course of an Internal Affairs investigation would be given only when compelled with a <u>Lybarger</u> admonition.  He further advised that by policy, any <u>Lybarger</u> compelled statement would not be furnished to the District Attorney's Office in conjunction with a criminal investigation.[1]  He did, however, provide Sheriff's Operational Orders, jail logs, written training materials and a timeline spreadsheet regarding removal of inmates from cells.[2]

On January 18, a written request was delivered to the Sheriff's Department asking for a copy of statements made by personnel who were not targets of the Internal Affairs investigation. A second request was made directly to Captain Powell on February 2.  He again declined to provide statements from non-targets of the Internal Affairs investigation citing the terms of the agreement with the DSA as precluding such a disclosure. After considerable discussion, Captain Powell did release the names of Sheriff's personnel, sworn and civilian, who were witnesses to the December 1 cell extractions.  He also provided three non-compelled statements taken by Internal Affairs investigators from Deputy Michelle Ball, Deputy Aimee Phillips and Lieutenant Gordon Smith.

On February 9, Sgt. Coffman contacted District Attorney Investigator Jeanne Williams and told her Assistant Sheriff Lind had directed him to notify us that employees would not be compelled to talk to or give a statement to the District Attorney's Office regarding this incident.  This blanket rule applied not only to persons who might be targets of the investigation, but also to employees who were not targets.  Sgt. Coffman told Investigator Williams that we could attempt to contact these officers but he believed they would not talk to us.

Between February 12 and 28, District Attorney investigators were able to interview two nurses, Janice Koci and Dorette Behrendt, Lieutenant Gordon Smith and Deputy Phillips.  However, Deputy Ball did not respond to a request for an interview.

On March 17, Don Steed, Supervising Deputy District Attorney of the Special Investigations Unit met with Assistant Sheriff Lind to discuss the status of this case. Lind again advised Steed that since the Sheriff's Department was conducting an internal affairs investigation as opposed to a criminal investigation that the Peace Officer Bill of Rights[3] prevented him from providing compelled statements of any employees who were targets of their investigation. He further advised Steed that on this basis, his office was precluded from providing any further information. Steed told Lind that our office would be sending letters to all Sheriff's personnel interviewed by Internal Affairs investigators asking them to voluntarily participate in interviews by the District Attorney's staff regarding this incident.  Lind was assured that the letter would clearly state that

---

[1] <u>Lybarger v. City of Los Angeles</u> (1985) 40 Cal.3d 822: As a matter of  constitutional law, a public employee has no absolute right to refuse to answer potentially incriminating questions posed by his employer.  If the employee claims that by answering employer questions he may incriminate himself, then he is ordered to answer but is guaranteed that his statement will not be used against him in any subsequent criminal proceeding.  This procedure is deemed to be adequate protection for the employee's right against self-incrimination.  See also <u>Garrity v. New Jersey</u> (1967) 385 U.S. 493.
[2] See Attachment E, an expanded version of this document.
[3] Public Safety Officers Procedural Bill of Rights Act, Calif. Gov. Code sections 3300-3312.

our investigation was independent of the Sheriff's Department investigation. In addition, Steed requested a complete list of all employees involved in this incident.

On March 22, a list of names of sworn personnel involved in this incident was sent to Assistant Sheriff Lind for him to confirm.  The next day Lind provided an updated list containing three additional names, one deputy and two sergeants.  On March 24, Lind responded, noting that the three had been given the <u>Lybarger</u> admonition and the Sheriff's Office would not make their statements available to us.

On March 23, the District Attorney's staff delivered fifteen letters to the Sheriff's office for distribution to the sworn officers identified as having been involved in the December 1 incident, seeking their cooperation in the investigation. Only one officer responded to the letter and she declined to be interviewed on the advice of legal counsel provided by the DSA.

On April 6, Chief Deputy District Attorney Cindy Besemer, Assistant Chief Deputy District Attorney Albert Locher, and Supervising Deputy District Attorney Steed met with Assistant Sheriff Lind to express concerns about his department's handling of this matter and the lack of cooperation with our office.  Our concerns were twofold.  First, we were concerned about the apparent use of <u>Lybarger</u> admonitions and the taking of <u>Lybarger</u> compelled statements from persons who were neither targets, nor suspects.  <u>Lybarger</u>, its progeny, and the underlying federal authority (<u>Garrity v. New Jersey</u> (1967) 385 U.S. 493) are grounded in the Fifth Amendment right against self-incrimination.  That right may be invoked when a person faces the danger of prosecution.  The policy that had been described to us (giving a <u>Lybarger</u> admonition and compelling statements from every sworn officer interviewed in an IA investigation, whether criminal suspect, target of discipline, or witness) goes far beyond that.  Neither the Peace Officer's Bill of Rights (the applicable section being Government Code 3303(h)) nor any case law compels such a sweeping practice.  Officers who are mere witnesses face no danger of prosecution, nor do officers who may face discipline for non-criminal employment infractions. Using a <u>Lybarger</u> admonition to compel the statements of mere witnesses, then shielding those statements behind the veil of personnel records confidentiality, does less to protect the witness officer's rights than to insulate any suspect officer from effective review of possible misconduct.[4]

Our second concern was the withholding of all compelled statements and indeed all personnel file material from the District Attorney's Office.  We have, in the past, elected to forgo obtaining the compelled statement of an officer who is the target of a criminal investigation.  We have also asked for and received access to peace officer personnel files when in our judgment the situation warranted.  California law makes it clear that such statements (even the compelled statements of suspect officers) are not confidential from the District Attorney conducting an investigation into peace officer conduct, and the District Attorney needs no court order to obtain such records.[5]

---

[4] Indeed, in any ordinary circumstance where an incident which warranted referral to the District Attorney's Office occurred in the Sheriff's jurisdiction, and was witnessed by a Sheriff's officer, it would be a routine matter for the officer to write a report.  If for some reason the officer did not write a report in the first instance, it would be routine for our office to request one if needed, and for the officer to provide one.  We can conceive of no legitimate reason why that routine practice does not extend to this situation.

[5] Penal Code § 832.7(a); <u>People v. Gwillim</u> (1990) 223 Cal.App.3d 1254 3d 1254; <u>Fagan v. Superior Court</u> (2003) 111 Cal.App.4th 607.

The District Attorney's Office recognizes our responsibilities with respect to the release of information in such records, or the use of any compelled statement against the officer who made the statement.  Once we have determined that we intend to review these materials, the Sheriff has no statutory or other authority for withholding them from the District Attorney's Office.

In the April 6 meeting we asked for the compelled statements of all employees except Sgt. Black, since we had determined he was the focus of our investigation (although even in that event, we are legally entitled to have his compelled statement if we choose).  On April 10 Assistant Sheriff Lind had the compelled statements of the involved officers interviewed during the Sheriff's administrative investigation delivered to the District Attorney's Office. The information was provided, according to Assistant Sheriff Lind, in compliance with the confidentiality exception provided in Penal Code section 832.7 and <u>People v. Gwillim</u>.


## IV.  THREE POINTS OF DECISION & ACTION BY SHERIFF'S JAIL STAFF

Three points of decision and action involving the use of force by sheriff's staff have been considered in this case – the forcible cell extractions, the use of flash-bangs in the cell extractions, and the restraint of the inmates in prostraint chairs after they were extracted from their cells.

<u>A.  Use of Force in Cell Extraction</u>

As the facts develop, the first point that raises questions is the decision to remove the inmates from their cells by means of forcible cell extractions.  An alternative would have been to give each inmate the opportunity to leave his cell voluntarily, without resorting to force.  This section sets out the facts as to how forcible cell extractions came to be used.

According to the information received, the CERT team was organized in a jail conference room and a pre-extraction briefing conducted by Sgt. Black and CERT Team leader Deputy O'Brien. They reviewed the history of each inmate and emphasized the potential danger involved in the extractions, particularly from inmates Toro and Kerwin, who were identified gang members. The responsible inmates were housed in single cells in the 400 pod because of their jail disciplinary history, which included assaults on other inmates and threats to jail staff.  There is no evidence that during the pre-extraction briefing, Sgt. Black ordered flash-bangs to be used.  Neither is there evidence that voluntary inmate exits were considered.  Based on accepted techniques there is evidence that the facts of each extraction situation would dictate whether a diversionary device was needed and the degree of force needed.

Due to the position of the video camera that recorded the extractions, the video does not show what occurred inside each cell.  In three of the six extractions, reports or statements indicate the inmate was not on the cell floor as directed when the officers entered.  In three of the extractions, statements indicate the inmate struggled, and in three the inmate hid and/or resisted presenting his hands for cuffing.  [As to these factors, it varies from case to case which factors were present in which extraction.  See Attachment C.]  The audio track on the video allows us to hear some of what was spoken, and in some of the cases voices are heard stating, "Quit resisting."  There are

also sounds consistent with physical force being applied. Once each inmate was cuffed and shackled, the officers moved him to the lower tier where he was secured into a prostraint chair. Attachment C gives a detailed description of each individual extraction.

The involved officers submitted written reports that listed justification for the forcible extractions of the inmates based upon their criminal histories and deviant jail behavior. The officers who inserted the flash-bangs indicated they did so at the direction of Sgt. Black, believing that the inmates had failed to comply with his directives. Each team member stated they acted in a departmentally approved manner and at no time maliciously exposed an inmate to risk of injury when the flash-bang was inserted or when physical force was applied. The staff denied there was a pre-extraction plan to use a flash-bang in every cell and to use force to remove each inmate. However, the officers stated they expected these particular inmates to resist and anticipated the need to use force to remove the inmates from their cells. Based upon all the evidence, the voluntary exit of the inmates was never considered an option and no such opportunity was offered to the inmates.

B.  Flash-bang Diversionary Device

The next decision of significance relates to the use of flash-bang grenades as part of each extraction.  A flash-bang was deployed in the confined space of each inmate's cell, and resulted in injury to two of the inmates, so the reasonableness of its use must be evaluated.

The flash-bang[6] produces an explosive report, flash and some smoke, temporarily creating a state of confusion or disorientation.  One of the intended uses for the device is in cell extractions.  It is designed not to injure, but there is potential for injury when the device is deployed within two and one-half feet of a person.  The device is meant to temporarily distract the inmate from making an organized defense, giving officers a significant tactical advantage in gaining control of the subject.  It should only be deployed by trained personnel.

Lt. Gordon Smith was identified as the Sheriff Department's leading authority in the use of diversionary devices, including the flash-bang. He was interviewed by investigators from the Internal Affairs Division and the District Attorney's Office and had an opportunity to review the video/audio recordings of the cell extractions and reports of the December 1 incident. He provided this office with training materials that are the source of reference for Sheriff's personnel in the use of a flash-bang device in a custodial setting. Lt. Smith has had extensive training and field experience in cell extractions and the actual deployment of flash-bang devices in a custodial setting.  He instructs law enforcement personnel throughout northern California on these topics.

During an interview with Captain Powell on December 27, Lt. Smith stated the conduct of the inmates during the entire incident of December 1 (i.e. the cell flooding, yelling, banging on doors, etc.) did not present "any real exigency".  This opinion was based upon his review of the video recording, the nature of the incident and his past experience as a jail watch commander.

---

[6] Combined Tactical Systems, Inc. manufacturers the Model 7290 Flash-bang Tactical Grenade. According to the company the device is designed for and is frequently used in cell extractions.  Potential problems occur when the device is deployed too close to a person, which can mean the subject is exposed to "over pressure" and the "fireball."  The device very briefly reaches a temperature of 4,000 degrees, but has a low fire potential.

The inmates were secured in their cells and there did not appear to be any uprising by the inmates. Lt. Smith stated that, depending on the demands of the particular situation, the use of a flash-bang in a cell may be acceptable as part of a cell extraction.

Lt. Smith stated officers are instructed that before deployment of the device into a cell, the location of the inmate must be known so that the flash-bang can be deployed into a safe location. The device will not cause injury when properly used. Lt. Smith instructs officers to perform a "quick peek" prior to deployment to determine if the inmate is compliant. He stated that Sgt. Black's order to each inmate, "Get on the [cell] floor," is acceptable practice. There is the option of having an inmate back up to the food port and place his hands through the port to be handcuffed. However, he stated this may not always be the most viable option depending on the history of the inmate and the immediate circumstances.

When Captain Powell asked if it is appropriate to introduce a flash-bang into a cell with the inmate on the floor, Lt. Smith responded that it depends on the circumstances but, in most instances, if an inmate is complying with instructions a flash-bang would not be deployed. He was asked his opinion whether or not the "quick peek" by Sgt. Black was adequate. He responded, "It's hard to tell from the video whether a peek actually even occurred…it appeared that all the deployments were done from a standing position and the only visible area that could have seen through would have been the food port". He was aware that Sgt. Black lifted the magnetic window covers and gave a command to the inmate before deployment of the flash-bang and believed there was an adequate period of time (up to five seconds) for the inmate to comply before the flash-bang was inserted. He also expressed the opinion that based upon the facts it appears there was a plan to extract all six cells in the same way and not have an individualized plan for each inmate.

Lt. Smith was questioned about the burn injuries and powder marks that some of the inmates suffered. He stated that the device would burn if it came into contact with a person as it detonates. The device should not be deployed in such a way as to come into contact with a person. The device is not intended to cause injury. He viewed photographs of the scorch mark on inmate Kerwin's pants near the upper thigh and stated that the mark is consistent with the subject lying on the cell floor, with the flash-bang against his leg when it detonated.

Regarding the injuries to inmate Morrision, Lt. Smith concluded that the inmate was most likely on the floor at the time the flash-bang was inserted into the cell, and face down on the cell floor when the flash-bang detonated in contact with or very near the left arm and chest. Captain Powell asked him if the inmate had complied with directions to lie face down on the floor and was otherwise compliant, would the deployment of the device have been proper. Lt. Smith issued a qualified response stating, "Not if he was otherwise compliant, had no other uh, combative history".

After examining the photographs of inmate Lucas' injures to the upper thighs and black soot on the floor of his cell, it was Lt. Smith's opinion that the injuries were consistent with a flash-bang device between the upper legs of the inmate at the time of detonation. If the inmate had moved to the cell floor in compliance with instructions and offered no resistance, the deployment of the

device would have been inappropriate in most instances. The injuries, according to Lt. Smith, clearly establish that the inmate was on the floor when the device was deployed and detonated.

In summary, Lt. Smith stated that three inmates were in a prone position on the cell floors at the time the flash-bangs detonated. Furthermore, he considers it inappropriate to insert a flash-bang into a cell in such a manner as to come into contact with a person.

C.  Prostraint Chair

The decision to and actions of placing the inmates in prostraint chairs is evaluated because of the length of time each inmate was left in the chair.  This raises the question of whether it was used as punitive action, inhumane treatment or corporal punishment of a prisoner, as prohibited under Penal Code sections 147 and 673.

The literature reviewed indicated that this restraint device is in use throughout the United States and internationally in jails, state, and federal prisons, mental health institutions, and by both the Immigration and Naturalization Service and the U.S. Marshall's Service. However, the use of this device is not without controversy and was related to the in-custody death of a Sacramento County jail inmate in 1995[7].  Generally, the device is used to provide safe containment of an inmate exhibiting violent or uncontrollable behavior and to prevent self-injury, injury to others, or property damage when other control techniques are not effective. The prostraint chairs are on wheels, which allow the safe movement of an inmate while restrained. Sheriff's Operations Order 3/100 is consistent with the suggested procedural guidelines by the manufacturer and the American Correctional Association Standards for Adult Correctional Institutions.

In this case after the cell extraction, each inmate was secured into a prostraint chair and examined by a staff nurse in the 8 West classroom. The examining nurses heard the detonations but were unable to see any activity associated with the extractions. As the inmates were moved to the classroom, the nurses checked their vital signs and the pressure of the restraints on the inmates' hands and legs after being placed into the prostraint chairs as required by Operations Order 3/101[8].  The inmates were then moved to other locations within the facility and monitored. All of the inmates were eventually examined by Dr. William Robinson and cleared for continued incarceration. There is no evidence of any injury from this procedure, nor did the inmates complain of injury as a result of confinement in the prostraint chair.

General Order 3/100 permits the use of this restraint device to control a physically resistive inmate[9]. Except in a case of exigent circumstances, placement in the chair requires the approval of a Watch Commander and the presence of a supervisor. A medical evaluation must occur when inmates are initially placed in the device, and if restraint exceeds the one hour period, a follow up evaluation must occur every two hours. Unless extended by a Watch Commander for good cause, no inmate is to be restrained in the chair for longer than one hour. Additionally, the inmate must be visually observed at least twice every thirty minutes.  A safety segregation cell log sheet

---

[7] The Progressive Magazine, April 2000, "The Devil's Chair" by Anne-Marie Cusac; 1997-98 Sacramento County Grand Jury Final Report, Complaint 98-55.
[8] Sheriff's Department Operations Order 3/101, Use of Prostraint Chair, revised 4/03 (Main Jail).
[9] Sheriff's Department Operations Order 3/100, Use of Restraints, revised 4/03 (Main Jail).

must be prepared and maintained during the restraint process. The Order specially prohibits the use of the chair for "punishment".  The time can be extended by the watch commander, but the reason must be in writing, and only when clear and articulable facts justify continued retention[10]. If the restraint exceeds the one-hour limit, a further medical screening must occur.

All of the extracted inmates were confined to prostraint chairs for more than two hours. Segregation Logs recorded the visual observations of each inmate. An inter-office memorandum to Jail Commander Mark Iwasa was prepared by Sergeant Hayes, articulating the reasons for the use of the chair restraint in excess of one hour for each inmate. The justifications for extended time in the prostraint chairs were made on a pre-printed form that allowed Sgt. Hayes to check applicable headings and add comments. All of the letters had a "cookie-cutter" appearance and listed the primary reason for the continued retention in the chair as "combative behavior".

Inmate Toro was the last to be removed from the chair at 11:37 p.m.  He was then handcuffed to a drain in a safety cell (padded) till 7:00 a.m. December 2. The other five inmates were relocated to different cells located throughout the main jail facility.

## V.  APPLICABLE LAW AND ANALYSIS

### A.  Law Applicable to Use of Force in Jail

The District Attorney's Office must evaluate the evidence in this case according to the controlling legal standards. The issue presented is whether the evidence proves beyond a reasonable doubt that the officers' use of force was unlawful or excessive, such that there is a reasonable likelihood that a jury would vote unanimously to convict the officer. The legal authority applicable includes Penal Code Sections 147, 149, 673, 835, 835a, 2652, as well as state and federal case law.

Custodial officers may use reasonable force on a prisoner to enforce jail regulations or when necessary to prevent a prisoner from doing bodily harm to a prison official or other inmates. However, the federal and state constitutions prohibit the infliction of cruel, inhuman or excessive punishment on prisoners. In recognition of these constitutional rights, the Penal Code of California carefully restricts correctional authorities in the treatment of prisoners. Section 147 provides that an officer guilty of "willful inhumanity or oppression" towards a prisoner is subject to a fine or removal from office. Section 673 makes it a misdemeanor to use any "cruel, corporal or unusual punishment" upon a prisoner. Section 149 provides that: "Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine…, or by punishment in state prison… or in a county jail …or by both fine and imprisonment".

A number of factors are considered in determining whether or not the use of force was objectively reasonable. These include the severity of the disruption, whether any of the inmates posed an immediate threat to the safety of the officers or others, whether the inmates were actively resisting or attempting to resist removal from their cells, whether the physical force applied was of such an extent as to lead to injury, the duration of the action, the number of

---

[10] Operations Order 3/101 does not define or suggest what are "clear and articulate" facts justifying an extension.

persons with whom the officers had to contend with at one time, and the possibility that the inmate is violent and dangerous.

Courts are historically reluctant to interfere with the discipline and control of inmates in a correctional setting. While custodial officers are to be held strictly to account for imposing cruel, inhuman or excessive punishment on prisoners, officials will not be censored because they defend themselves when attacked and/or use force to subdue recalcitrant inmates. In re George Edward Riddle (1962) 57 Cal.2d 848.

For our purposes, the legal standard is whether the evidence demonstrates beyond a reasonable doubt the force used was excessive, and not reasonably necessary to compel compliance by the inmates with jail regulations and/or to prevent an inmate from doing harm to a jail official.  Put another way, we must determine whether twelve jurors would unanimously agree the force used was so unreasonable that it was criminal.

B.  Decision to Make Forcible Cell Extractions

Sergeant Donald Black was a sixteen year veteran of the Sheriff's Office.  On December 1, he was a recently promoted probationary sergeant.  He was designated as the main jail shift Watch Commander during the evening of December 1. Sgt. Black and the three other sergeants on duty at the jail that night (Scott Hayes, Russell Munn and Kelly Lara) were all still on probation. These were the only sergeants on duty.  No one at the management level (i.e. above the rank of sergeant) was present in the jail that night, nor was any senior administrative staff contacted until after the extractions had occurred.

Under existing Sheriff's policy, Sgt. Black was not required to notify off-duty command staff of the flooding or extractions, since the event did not qualify as a "major incident" under Sheriff's General Order 2/40. The definition of a major incident includes escapes, explosions, riots and hostage situations. According to jail commander Captain Iwasa and Lt. Smith, flooding of cells and forcible extractions are common occurrences and generally do not rise to the "major incident" level.

Sheriff's Operations Order 2/30 required that a Custody Emergency Response Team (CERT) be maintained on each watch and directed by a CERT Sergeant or a tactical supervisor.  CERT teams were established to reduce the risk of injury to staff and inmates. A CERT team was on-duty the evening of December 1 and included officers who had received special training on cell extraction techniques and the use of tactical equipment such as flash-bangs. Deputies O'Brien, Fermer and Reeve had been formally trained and participated in the deployment of the flash-bang diversionary devices in a custodial setting and were aware of the dangers involved.

Between 7:57 p.m. and 8:27 p.m., Sgt. Black conducted a briefing in the jail conference room with the CERT team and Sergeants Black, Munn, and Hayes. Sergeant Black and CERT team leader Deputy O'Brien focused on the potential dangers involved with the extractions of the five upper tier inmates particularly Michael Toro and Jessie Kerwin. The jail disciplinary write-ups were reviewed and the inmates' pending criminal charges were discussed.  The officers discussed the inmates' past violent behavior in the jail, which would be a basis for concern of

officer safety in a confrontation with these inmates.  No consideration was given to directing each inmate to voluntarily exit the cell, or to the fact that the inmates were locked in cells thereby unable to cause further flooding or physical harm to themselves, staff or other inmates. There were no reported threats made by the involved inmates towards jail staff at the time of the flooding or once the water flow was shut off and the cell door windows covered. In fact, the 8th floor control log has no notations relating to the involved inmates between the discovery of the flooding and the extractions. The tenor of the briefing was the perceived danger the inmates posed during extraction and the likely need to utilize diversionary devices and non-lethal munitions.

We consider the Sheriff's Operations Orders since adherence to them reflects on whether the officer's actions were reasonable.  Sheriff's Operations Order 2/20, Cell Extraction Procedures, gives the CERT Sergeant or other tactical supervisor broad discretion. The suggested procedure is: 1) direct the inmate to exit the cell voluntarily; 2) give the inmate reasonable time to exit the cell; 3) authorize extraction if the inmate does not comply, and if the inmate does comply then the Sergeant is to determine the appropriate action. As already noted, there is no evidence the inmates were afforded an opportunity to voluntarily exit their cells. In fact, the video recording confirms such an opportunity was never contemplated.

While Order 2/20 suggests that an inmate should be given an opportunity to voluntarily exit the cell, it also allows the sergeant or tactical leader broad discretion to authorize forcible extraction even if the inmate complies. This is undoubtedly to account for situations where an inmate may feign compliance until he sees an opportunity to resist or attack.  Still, the Order is ambiguous, confusing and fails to require an attempt or even an evaluation of whether a voluntary cell exit can be made in a safe, controlled manner before resorting to a physical confrontation.

Based upon the inmates' criminal histories, the nature of the jail disruption and disciplinary write-ups which included threats to jail staff and other inmates, Sgt. Black chose the option of removing the inmates with a CERT team. This course of action seems to be within the parameters of Order 2/20.  All the officers appear to have considered the inmates extremely dangerous, defiant and capable of assaulting staff.  From an outside perspective, one reasonable course of action would have been to give each inmate individually an opportunity to be handcuffed through the food port and voluntarily exit the cell to avoid the dangers associated with physical confrontation. Once the inmate is handcuffed, the potential for resistance or assault is greatly reduced.  Still, Sgt. Black's choice to physically remove the inmates was not inconsistent with Operations Order 2/20.  In terms of the legal standard, we believe there is no reasonable likelihood that a jury would unanimously conclude that Sgt. Black's decision was so unreasonable that it was criminal in nature.

C.  Use of Flash-Bangs

At 8:27 p.m., the CERT team arrived in the 400 pod on the 8th floor. The team was in possession of assorted non-lethal weapons including flash-bang grenades. The standard procedure, executed here, was for the initial officer to enter using a shield accompanied by at least two other extraction officers. This set-up is referred to as "stacking" the extraction team. Additional members of the team were available outside the cell to assist, if necessary. Each cell extraction is detailed individually in Attachment C.

The California Supreme Court discussed the deployment of a flash-bang device in <u>Langford v. Superior Court of Los Angeles</u> (1987) 43 Cal.3d 729.  There, Los Angeles police officers had forcibly entered a residence for the purpose of executing a search warrant using a motorized battering ram and flash-bangs to divert and disarm the occupants. The petitioners claimed the use of the devices constituted excess use of force under the United States and California Constitutions. While the court agreed the motorized battering ram was excessive, it found that use of the flash-bang device was lawful. Expert testimony was cited showing that the flash-bangs are designed to produce dramatic pyrotechnics, not to injure, and should cause only minor skin burns at worst. One death caused by the device in 1984, when it exploded between the back of the subject and a wall, was considered a freak accident, and measures were taken to preclude a similar mishap by requiring officers to see fully into the target area before deployment.

Since there is no prohibition by statute or case law to the use of a flash-bang device, the question becomes whether the deployment of the device was lawful under the circumstances here. The evidence supports the conclusion that Sgt. Black and CERT team officers believed that these inmates were dangerous and needed to be removed, forcibly if necessary, from their cells. Certainly, if these inmates remained in their cells and the flow of water was restored, the toilets and sinks could continue to be plugged causing additional disruption which could encourage other inmates to participate, leading to the staff's loss of control of the floor. The officers were entitled to use reasonable force to ensure jail rules and regulations were followed, and to prevent an inmate from harming any jail official. Under the circumstances, the evidence does not establish that use of the flash-bang diversionary device was so unreasonable as to be criminally unlawful.

One troubling aspect of the extractions as they occurred is Sgt. Black's failure to observe the inmates for a reasonable period of time after giving the order to get down on the cell floor and before directing that the flash-bangs be inserted into the cells. The video established a pattern that Sgt. Black would peek under the window cover, give the order to get on the floor, and almost immediately close the cell window cover and order insertion of the device without a second peek to determine whether the inmate had complied. Only four seconds elapsed between the order and deployment of the flash-bang into Jessie Kerwin's cell.  After giving the order, Sgt. Black closed the window covering and made no attempt to peek into the cell again before the device was passed through the food port. During the extraction of Jason Morrison, Sgt Black ordered the inmate to the floor, closed the window covering, unlocked the food port and caused the flash-bang to be inserted within six seconds, again without any attempt to determine if the inmate had complied with the instruction. Obviously Morrison did comply, since the burns he suffered demonstrate he was on the cell floor when the device detonated.  For inmate Daniel

Lucas, ten seconds elapsed between the time Sgt. Black ordered him to his cell floor and the flash-bang was inserted into his cell. The burns to Lucas' inner thighs show that he was undoubtedly prone on the cell floor at the time the device detonated. In none of the extractions did Sgt. Black make any attempt to determine whether the inmate had complied with his instruction before the flash-bang device was inserted into the cell.

The use of tactical weapons is governed by Sheriff's Operations Order 3/150.[11] The order mandates that any officer using the weapon must be specially trained and must adhere to the Department General Orders in conjunction with any federal, state or local regulation. The order does not specially describe the procedures for the deployment of the flash-bang. The officers involved in the deployment of the flash-bang devices during this incident had received special training and were aware of the dangers associated with its deployment.

One possible inference is that the use of the flash-bangs was punishment of the inmates for flooding the cells. However, it is a reasonable inference from the evidence the officers believed the flash-bangs were necessary to remove these inmates. For purposes of evaluating reasonable doubt the law requires that we accept any reasonable inference favoring the officers. The evidence does not prove beyond a reasonable doubt that the officers inserted the devices with the specific intent to cause physical harm to an inmate.

Unfortunately, the deployment of the devices resulted in injuries to some of the inmates. However, the fact that some of the inmates did lie down on the floor as directed does not amount to proof beyond a reasonable doubt that the officers' actions were criminal. While one possible conclusion that can be drawn is that the officers exercised poor judgment in deploying the flash-bang, it is a conclusion that must be evaluated in the context of these inmates' history of violent and disruptive behavior. Resisting inmates may give the appearance of complying in order to mislead officers, then will resume resistance as soon as the opportunity allows. The failure to exercise reasonable care in the deployment of the flash-bangs does not alone support criminal charges for the excessive use of force.

D.  Force Used to Remove Inmates After Flash-bang Deployment

Turning to the actual physical force used by the officers to remove the inmates from their cells, there is insufficient evidence to prove beyond a reasonable doubt that excessive force was used in any of the extractions or that the use of force was punitive. This conclusion is based upon the facts contained in the casualty reports, the video and audio recording of the extractions (which as noted provide an incomplete record due to the vantage point and battery failure), and other information developed during the course of the investigation.

The inmates involved in the disturbance were legally obligated to submit to the custody of the officers. Custodial officers may use reasonable force upon a prisoner to enforce proper prison regulation or where necessary to prevent a prisoner from doing bodily harm to a jail official. In re Riddle, supra, 57 Cal.2d 848; O'Brien v. Olson (1941) 42 Cal.App2d 449. The officers

---

[11] Sheriff's Department Operations Order 3/150, Tactical Weapons and Equipment, revised 9/02 (Main Jail) requires that any officer deployment tactical weapons, including flash-bang devices, shall be trained in their use. The flash-bang device is listed in the order as "authorized" for use in the jail.

reported that the physical force used on each inmate was only that necessary to subdue the inmate when he refused to obey proper orders and became violent. There is no evidence tending to show that the force used was applied for the purpose of punishing the inmates for violating the rules of the facility. The fact that force was applied shortly after the inmates had flooded their cells and the surrounding area does not prove that the officers acted with criminal intent to retaliate for the flooding.  In fact, the persistent disturbances and violation of rules, combined with the background of the inmates, provide a basis for the officers having a reasonable fear the inmates would resist any effort to subdue them.

The most seriously injured inmate, Michael Toro, was considered the most dangerous of the group to be extracted. Toro had serious and violent charges pending and had a jail history of defiant behavior that included threats of harm to jail staff. The officers involved in his extraction, as reported in the casualty reports, stated he refused to expose his hands which he buried under his body and kicked at officers attempting to restrain his legs. As a result of his actions the officers resorted to physical force to overcome his resistance. While the camera failed to record the action inside the cell, it did capture audio which tends to corroborate the officers' version of the encounter.  The type of force used is not in and of itself proof of excessive force. The fact that inmate Toro was struck with fists rather than a baton or other object was not unreasonable under these circumstances and does not amount to criminal misconduct.  Excepting the flash-bang burns to Morrison and Lucas and the injuries to Toro, the injuries to the inmates were very minor and of the type commonly experienced during routine handcuffing and leg shackling.

While the inmates' versions of events differ from the jail staff's version, that is not a sufficient basis for a criminal prosecution of the officers.  Considering their records, pending charges, and behavior history in the jail before this incident, the inmates have significant credibility problems. Evaluating all the evidence, we find the staff's version of this event to be more credible than the inmates.  We believe a jury would reach the same conclusion.  Because the officers' efforts to remove the inmates from the cells were lawful, and because there is no credible evidence to support a finding that any of the officers harmed the inmates intentionally without legal justification, there is insufficient evidence to support criminal charges against the extracting officers for excessive force.

E.  Prostraint Chairs

One might argue that the extended period of time the inmates were confined to the prostraint chairs was a form of retaliation or punishment. Additionally, the primary justifications stated on the inter-department correspondence addressed to Captain Iwasa by Sgt. Hayes for the extended confinement were nearly the same, having a "cookie-cutter" appearance.  In the letters pertaining to inmates Countee and Jefferson, the first paragraph begins with the phase "Continues to exhibit bizarre and suicidal behavior that will most likely result in the unnecessary endangerment to both staff and prisoners if removed from the prostraint chair." However, the letters do not state clear and articulable facts that would support the conclusion that these two inmates were suicidal or exhibiting bizarre behavior during the extraction process or while restricted to the chair.   In the other four letters Sgt. Hayes stated the number of jail disciplinary write-ups each has suffered and justifies the extended restraint because each inmate had to be "forcibly removed from their cells and was resistive to deputies efforts to remove him." The language contained in Operation

Order 3/101 appears to require that the Watch Commander state "clear and articulable facts" justifying the continued retention. Sgt. Hayes' letters seems to be lacking the required articulation of facts to support the use of the prostraint chairs for more than two hours.

While these facts raise questions whether the use of prostraint chairs for over two hours was inhumane or corporal punishment under these circumstances, the evidence does not prove beyond a reasonable doubt that the use and confinement of the inmates in the prostraint chairs was criminal.

## VI.  CONCLUSION

Individually or collectively, all of the above facts do not prove beyond a reasonable doubt that the actions by the officers in the forcible extraction of the six inmates from their cells on December 1 involved criminal misconduct.  The evidence supports findings of poor judgment by jail staff, lack of administrative supervision and a need to review the Operations Orders pertaining to the use of force in the main jail.  It appears that for the entire main jail staff and the population of approximately 2000 inmates, no management level officer was on duty, and the entire operation was under the control of a probationary supervisor, who had the discretion to direct and conduct all the events described here without any requirement under existing procedures to consult or advise any management staff.   Further, the manner in which the Sheriff's Department brought this case to the District Attorney for criminal investigation, followed by the unwillingness to be responsive to legitimate investigative requests from this office, and the overuse of <u>Lybarger</u> admonitions to witness officers, hampered our ability to conduct a thorough and independent investigation.

Nonetheless, applying the controlling legal standards to the factual record in this case, we find insufficient evidence to support a criminal charge related to the use of excessive force against any of the officers involved.  While this case raises significant questions regarding jail operations and the treatment of inmates, our decision here, as in any case, must be based upon what the evidence proves.

Sincerely yours,

JAN SCULLY
DISTRICT ATTORNEY

ALBERT C. LOCHER
Assistant Chief Deputy

cc:    Jan Scully
       Lou Blanas

ATTACHMENT A

DETAILED CHRONOLOGY OF MAIN JAIL INCIDENT OF
DECEMBER 1, 2005

- 6:00 p.m.: Sacramento Sheriff's Deputy R. Kacalek, working as a floor officer in the Main Jail received information from an inmate that other inmates housed on the eighth floor, pod 400, were going to flood their cells during the evening hours. The officer conveyed this information to the evening shift personnel at 6:40 p.m. It is unknown what action, if any, was taken by jail officials in response to this information, since the documents reviewed are void of any information except for a supplemental one page report prepared Deputy Kacalek noting his contact with the informing inmate.

- 7:33 p.m.: Deputy Paul Labane and Deputy Justin Mulherin observed water flowing over the walkway of the upper tier in the 400 pod, 8 floor West. The water was found to be escaping from under the doors of cells 411, 412, 416, 419 and 420. A single inmate occupied each cell with access to running water from a sink and toilet. A significant amount of water had drained onto the main floor of the pod and was flowing to other areas of the 8th floor at the time of discovery.

- 7:34 p.m.: Deputy Courtney Bartilson and Deputy Labore terminated the flow of water to the flooding cells.

- 7:43 p.m.: Sergeants Scott Hays and Sergeant Russell Munn arrived at 400 pod and identified the cells and inmates responsible for the flooding. They requested further assistance resulting in the arrival of Deputies Ball, Vierra, VanAssen, Margetti and Philips along with a group of inmate trustees who begin to restrict the water from flowing out of the 400 pod. During this process, the officers reported that inmates housed in the pod were shouting, yelling and kicking the insides of their cell doors. Sergeant Hays contacted Watch Commander, Sergeant Donald Black by radio and requested the assistance of the Custody Emergency Response Team (CERT) to remove the five responsible inmates from their cells. The 8th floor West area was locked down and the trustee inmates involved in the water clean up were removed from the pod. The windows of the five cell doors on the upper tier were covered with a material that attaches to the metal doors by magnets. This action prevented the cell occupants from seeing anything outside the door. The five involved inmates were identified as Michael Toro cell #412, Jessie Kerwin cell #411, Courtney Countee cell #416, Jason Morrison cell #419 and Daniel Lucas cell #420.

- 7: 57 p.m-8:27 p.m..: Sergeant Black contacted the CERT members[12] on duty in the main jail and instructed them to dress out in protective clothing and meet in the second floor conference room for a pre-extraction briefing. At the briefing teams members were

---

[12] Custody Emergency Response Team: Donald Black, Paul Labance, Michael Keegan, Nate O'Brien, James Crouson, William Starr, Courtney Bartilson, Frank Fermer, Claude Torrey, Joseph Reeve.

informed that an emergency situation was occurring on 8 West involving five inmates who had clogged their toilets causing flooding in their cells and the 400 pod. The briefing was lead by Sergeant Black and CERT team leaders Deputies Nate O'Brien and Frank Fermer. According to the reports and transcripts, the team was briefed on the inmate's criminal histories, jail incident/ disciplinary write-ups and the perceived potential threat each presented. There is no evidence of any discussion about allowing an inmate to voluntarily exit his cell.  It was assumed that force would be necessary, based upon the coordinated nature of disruption combined with the inmates' violent and serious criminal histories and history of defiant jail behavior.

- 8:27 p.m.: Sergeant Black and the CERT team arrived on 8 West in the 400 pod. The team was in possession of assorted non-lethal munitions, including flash-bang grenades, Sage, Stingballs and OC spray obtained from the jail armory. The group, lead by Sgt. Black, walked up the tier leading to the five cells with Deputy Ball following recording the actions with a video/audio camera.

- 8:36 p.m.-9:14 p.m.: The forcible extractions begin with the removal of inmate Michael Toro from cell #412 and ending with inmate Claudis Jefferson from cell #404 on the lower tier[13]. Prior to the opening of each locked cell by Sgt. Black with a key, he pulled the corner of the door window cover back, peered inside the cell and ordered each inmate to move to the cell floor. Once the order was given, Sgt. Black immediately recovered the window, unlocked the small food port in the center of the cell door and either verbally or by a nod of the head authorized the deployment of the flash-bang grenade into each cell through the small opening in the door. Once the order was given and the covering replaced on the window, the flash-bang was inserted into the cell without warning or another look into the cell to determine if the inmate had complied with the instructions. After the flash-bang ignited, usually within 2 to 3 seconds after insertion, Sgt. Black opened the cell door and a group of three officers rapidly entered the cell and engaged the inmate. Once the inmate was neutralized, his hands were cuffed behind his back and his legs shackled. This same procedure was repeated at each cell.

- During each extraction the video/audio camera captured the movement of the officers outside the cells as well as portions of the conversations that occurred before, during and after contact with each inmate. The recording displays a tape counter in minutes and seconds. Officers can be heard ordering the inmates to comply and cease resisting along with sounds consistent with the striking of body blows. However, the position of the camera was outside the cells resulted in more audio then video recording of the confrontation.  The extraction of Jefferson from Cell #404 was not recorded due to battery failure.

- 8:43 p.m.-11:37 p.m.: After each inmate was removed from his cell, they were all moved to a classroom located on the main floor of 8 West. Once inside the room, each inmate was physically restrained in a prostraint chair with the use of leg shackles and handcuffs. An on-duty jail nurse conducted a brief medical evaluation at the time each inmate was

---

[13] Inmate Claudis Jefferson was identified as attempting to incite the inmates on the upper tier by yelling for them to resist from his lower tier cell during the extraction process.

being placed into the prostraint chairs. The inmates remained in the chairs for more than two hours. Inmate Toro, the last inmate to be removed from a chair, was relocated to a safety cell at 11:37 p.m..

On December 2, each inmate was examined and photographs were taken of visible injuries. Photographs of the floors inside cells 404, 411, 412, 416, 419, and 420 were obtained to establish the location of each flash-bang when it exploded. In cell 412 (Toro's) black soot markings were found just inside of the cell door. In cell 411 (Kerwin), the burn marks were on the floor and wall, mid-way into the cell. The burn marks in cell 416 (Countee) were on the floor and wall under a metal table attached to the rear wall of the cell; cells 419 (Morrison) and 420 (Lucas) had burn marks on the floor in the center of the cell; and the photographs of the floor in cell 404 (Jefferson) did not reveal a visible burn pattern.

ATTACHMENT  B

INMATE INJURIES

- Michael Toro: At 7:45 a.m. December 2, 2005, inmate Toro was medically evaluated by the jail physician and referred to the San Joaquin County Hospital for further examination and treatment. He was treated for a laceration under the chin, a fractured nose, swelling of the tissue surrounding the right eye and cheekbone, bruises and contusions to the head and upper and lower lips and a broken tooth. Toro was cleared for continued incarceration and returned to the Sacramento Main Jail at 3: 33 p.m..

- Jessie Kerwin: At 11:20 p.m., December 1, Kerwin was medically evaluated after being released from the Prostraint Chair. He complained of pain to his rib cage and had powder burns on his pant near the right hip and upper thigh areas and bruising to both knees. Kerwin was moved to the fourth floor classroom pending re-housing.

- Courtney Countee: At 11:30 p.m., Countee was removed from the Prostraint Chair and medically evaluated. No visible injuries were apparent immediately after the extraction. However, minor bruising to his left ear and head were observed by investigators the next morning and he complained of pain to this right shoulder. He was placed in the fifth floor west classroom pending re-housing.

- Jason Morrison: At 10:35 p.m., Morrision was medically evaluated and found to have suffered flesh burns to his upper left chest and arm consistent with contact or near contact with a flash-bang device when activated. The nurse cleaned the injuries and applied medication before clearing him to be placed in the Prostraint Chair for continued incarceration. He was removed from the restraint at 11:10 p.m. and relocated to the 5th floor east.

- Daniel Lucas:  At 11:10 p.m.., Lucas was removed from the Prostraint chair in the jail medical center and treated for burns to the insides of both legs near the genitals. He also displayed bruising to left ear and temple areas. He was cleared by the doctor on duty for continued incarceration and relocated to the 6th floor east.

- Claudis Jefferson: At 11:30 p.m.., Jefferson was removed from the Prostraint Chair and medically examined for injuries. He complained of pain to his left wrist, which was wrapped with a support bandage. No other visible injuries were observed. Jefferson was cleared for continued incarceration and was returned to the 8 West classroom pending relocation.

ATTACHMENT C

DETAILS OF EACH INDIVIDUAL CELL EXTRACTION

The cell extraction details below are from the Sheriff's Casualty Reports, video and audio recording and witness statements.

1. Michael Toro - Cell 412:  At 8:26 p.m., Sgt. Black ordered Toro to the floor of his cell while looking through the door window. He gave the order twice before closing the window covering. Deputy Nate O'Brien pulled the flash-bang grenade pin as Sgt. Black unlocked the food port opening and Deputy O'Brien inserted the device into the cell. The device exploded immediately. Sgt. Black unlocked the cell door and a team of officers entered, the first holding a shield. The video view of this extraction does not expose details of what occurred inside the cell but the audio records voices stating, "Quit resisting" and sounds consistent with physical force being applied. The casualty report by Deputy O'Brien states Sgt. Black said Toro was still sitting on his bed with his right hand buried in his waist and was refusing to get on the ground as directed.  The extraction officers stated that Toro was taken to the floor but he refused to remove his hands from underneath his body preventing the officers from gaining control of his hands. Deputy Nelson reported that he struck Toro in the face with his fist "four to fives times" to gain control of arms and hands and prevent him from kicking the other officers. Once cuffed and shackled, the officers moved Toro to the lower tier where he was secured into a prostraint chair.

2. Jessie Kerwin - Cell 411: At 8:49 p.m., Sgt. Black looked into cell 411 and ordered inmate Kerwin to lie down on the floor. He then replaced the door window covering and advised the team that the inmate remained on his bunk. Sgt. Black unlocked the food port and Deputy O'Brien inserted the flash-bang, which detonated. Sgt. Black unlocked and opened the cell door and Deputies Torrey, Fermer and Nelson entered. Deputy Torrey stated that Kerwin appeared to be moving to the cell floor from his bunk as the team entered. He hit Kerwin with the shield forcing him to the floor. Deputy Torrey's statement is inconsistent with that of Deputy Bartilson who prepared the casualty report. Deputy Bartilson's report indicated that Kerwin was ordered to the floor "no less than three times" remaining seated displaying his fists before he was forced to the floor by Deputy Torrey with the shield. Deputy Torrey reported that he struck Kerwin with his fists on the shoulder area to get control of his hands. Deputy Bartilson's report indicates that Kerwin failed to comply with instructions to produce his hands and continued to struggle by kicking his feet. Kerwin was eventually handcuffed and shackled and secured in a prostraint chair.

3. Courtney Countee - Cell 416:  At 8:55 p.m., Sgt. Black ordered Countee to lie on the cell floor with his head towards the bunk and told the other officers that the inmate was in the back of the cell. Deputy Fermer's casualty report indicates that Sgt. Black again covered the cell window and nodded to the Deputy to deploy the flash-bang. Deputy Reeves pulled the pin and inserted the device into the cell through the food

port that was unlocked by Sgt. Black. After the detonation, Sgt. Black unlocked the door and Deputies O'Brien, Reeves and Fermer entered the cell. Countee was found on the cell floor and reportedly starting kicking at the officers as they attempted to secure his arms and legs. Deputy Fermer reported that he struck Countee "three to five times" with his fist on the right thigh, which allowed the officers to gain control of the inmate. Countee was cuffed and shackled and placed into a prostraint chair. Deputy Reeve stated he entered the cell to assist since Countee's movements were preventing the officers from gaining control of his arms and legs. Once inside, he grabbed Countee's arm but Countee was able to pull away disregarding directives to stop moving. Deputy Reeve then struck Countee with his fist on the left side of his head twice which caused the inmate to allow officers to gain control.

4. Jason Morrision - Cell 419:  Between 8:58 and 9:00p.m., CERT team members arrived outside cell 419. Sgt. Black looked into the cell by moving the window cover aside and ordered inmate Morrison to lie on the floor with his head towards the bunk. Moments later, Sgt. Black again covered the window and unlocked the food port stating that the inmate was in the back of the cell. He then nodded to Deputy Fermer to insert the flash-bang.  As Deputy Fermer removed the pin and inserted the device he noted that Morrision was not on the floor directly below the food port before placing the device in the cell. Once the device exploded, Sgt. Black unlocked the cell door and Deputies Keegan, Torrey and Bartilson entered. According to Deputy Bartilson's casualty report, Morrison was on the cell floor face down with his hands concealed. He refused to produce his hands and pulled away from the officers as they attempted to control his arms and legs. Deputy Bartilson further stated that he struck Morrision on the right shoulder "five times" before the officers were able to cuff his hands and shackle his feet. Morrision was removed from the cell and secured into a prostraint chair.

5. Daniel Lucas - Cell 420:  At 9:05 p.m., Sgt. Black removed the magnet window covering from the cell door, looked inside and ordered Lucas to the floor face down, replaced the window covering and opened the food port. Deputy O'Brien reported that he pulled the pin and inserted the flash-bang device into the cell. In the casualty report, Deputy O'Brien stated he observed the inmate in the process of kneeling down onto the cell floor when he inserted the device. Sgt. Black opened the cell door and officers entered and secured the inmate with handcuffs and shackles as he lay on the floor. Lucas was removed from the cell and placed in a prostraint chair.

6. Claudis Jefferson - Cell 404:  During the cell extractions of the five upper tier inmates in 400 pod, inmate Jefferson was identified as "inciting the other inmates in the pod to start yelling as well". At 9:15 p.m., Sgt. Black, while standing in front of Jefferson's cell, ordered him to stop yelling. Jefferson's response was "he did nothing wrong" according to the casualty report prepared by Deputy Starr. Sgt. Black instructed Jefferson to lie on his stomach on the cell floor then stated to the other deputies that the inmate was sitting on his bunk. Deputy Fermer inserted the flash-bang into the cell through the food port and it detonated. Sgt. Black opened the cell door and deputies Labane, Torrey and Starr entered the cell. Deputy Starr reported that Jefferson was sitting in an upright position on his cell bed and rolled onto the

floor only after being ordered to do so by Deputy Labane. Jefferson ended up laying near the toilet in a fetal position. Deputy Torrey gained control of the inmate's lags and Deputy Labane placed his left arm in a wrist lock. He was then shackled and handcuffed.  Jefferson was escorted from the cell and secured in a Prostraint Chair.

ATTACHMENT D

INMATE BACKGROUNDS AND STATEMENTS

**Michael Toro (X-2201565):** Pending charges – Murder (P.C. 187), Attempted murder (P.C. 664/187), Assault with a deadly weapon (P.C. 245(a)(1)), felon with a gun (P.C. 12021); forty disciplinary write-ups while in the jail.

In a statement on December 2, inmate Toro said that a group of inmates in his pod (8 West, 400 pod) flooded their cells because of the staff's failure to respond to inmates concerns over an unclean shower area. After a period of time he was told to get on the floor and he did so as a "smoke bomb" came inside the cell and exploded. Immediately thereafter, the cell door opened and a group of officers came in as he was putting his hands behind his back while lying face down on the floor. Toro states that while he was pinned face down on the floor he felt fluid coming from his nose and spit out a piece of his tooth. He also suffered a cut under his chin. He was then taken from his cell with a cloth covering over his face (spit mask) that filled with blood, placed in a restraint chair and eventually "chained" to a drain. He was treated the next day at a hospital and discovered he had suffered a broken nose, lost a tooth, cut his upper and lower lip and a had cut under the chin. He denies that he resisted and says he placed his hands behind his back as instructed before being struck in the face numerous times while pinned to the floor.

**Jessie Kerwin (X-3350881):** Pending charges – Robbery (8 cts.) (P.C. 211); over thirty disciplinary write-ups while in the jail, including assaults on staff and threats to staff.

In a statement on December 2, inmate Jessie Kerwin admitted to flooding his cell as a protest to living conditions in his pod. He recalls that the window to his cell was covered after the water was turned off and Kerwin recalls hearing someone order Toro to get on the floor, then the bang and voices telling Toro to stop resisting. He distinctly recalls hearing smacking sounds and grunting consistent with "like beating him (Toro) up". Believing that he would be the next cell, Kerwin stated that out of fear he tied a shirt around his head and put toilet paper in his ears and then a blanket over his head. He was told to get on the floor but was afraid because of the "bang" that was coming. As soon as he heard the explosion he dropped to the floor with his hands behind his back before the officers entered the cell. The officers immediately pinned his ankles and grabbed both arms. He recalls being struck with fists in the small of his back and being kneed in the ribs and groin. Kerwin denied that he resisted in any form even though the officers continuously yelled "quit resisting" until he was removed from the cell.

**Courtney Countee (X-2482601):** Pending criminal charges – Possession of Narcotics (H.& S. 11350)

In a statement on December 2 inmate Countee stated he was in his cell when he heard other inmates talking about "Niagara Falls" (cell flooding) as a protest. He admitted to flooding his cell by blocking the toilet causing it to overflow out onto the upper tier. After the water was cut off, his cell window was covered and he could hear movement outside his door as if someone was attempting to clean up the water. A short time later, he recalled hearing an inmate

"screaming out, 'I'm not resisting, I'm not resisting'". Out of fear, Countee attempted to dry his cell floor, then placed a blanket on the floor and got down onto it. An officer moved the window covering, peered inside and instructed him to turn his head away from the door. As he turned around he heard the food port open and the sound of an object being inserted.  Without warning there was an explosion near his face then a group of officers rushed into the cell. One of the officers pinned him to the floor with a shield. He remembers hearing an officer state continuously "stop resisting". He claims he was struck all over with fists and that his wrist was hyper-extended over his shoulder as he lay on the floor. Once he was handcuffed and shackled the officers pulled him to his feet and struck him in the face with a closed fist and kneed him in the groin. A spit mask was then placed over his face and was eventually placed in a restraint chair. Countee stated emphatically that he was prone on the cell floor when the officer peered in and ordered him to turn his head away from the door before the flash-bang was inserted. He claimed to have a black and swollen right eye, and abrasions to the back of his head and left elbow.

**Jason Morrison (X-2879706)**:  Pending charges – Murder (P.C. 187), Burglary (P.C. 459), Auto Theft (V.C. 10851); over thirty disciplinary write-ups while in the jail.

In a statement on December 2, inmate Morrison denied flooding his cell but stated that the other inmates did so to protest the lack of response by jail staff to poor living conditions. Morrision recalled an officer asking him if he had flooded his cell via the intercom, which he denied, before two officers came onto the tier and turned the water off. An officer shined a flashlight into his cell as he was emptying water from his toilet so he could communicate with other inmates, not to flood the floor. Moments later a covering was placed over the cell door window. He then heard footsteps, a "lot of commotion and…that's when the concussion grenades were going…' thrown into the cells". Morrision reported that once the group arrived outside his door, he was told to lie on his stomach. He claims to have moved onto the floor immediately as the food port was opened and a grenade inserted. The object rolled underneath his shirt and exploded as he lay face down on the floor. After the explosion, the cell door was opened and the officers rushed in. Morrison states he was struck numerous times in the face and mouth and his head pushed to the concrete floor numerous times as he was being handcuffed and shackled. According to Morrison, he suffered cuts inside his mouth, abrasions to the check, and burns to his left arm and chest. He denied resisting or attempting to assault any officers during the cell encounter and followed the directions that we given before the Flash-bang was inserted.

**Daniel Lucas (X-3687951)**:  Pending charges – Murder (P.C. 187), Attempted murder (P.C. 664/187); over thirty disciplinary write-ups while in the jail, including assaults and threats to staff.

In a statement on December 2, inmate Lucas admitted to flooding his cell to protest poor but denied that he resisted or failed to comply with staff instructions before the Flash-bang was inserted into his cell. He recalled hearing the explosions in other cells and the officers yelling "Quit resisting, quit resisting!" At his cell, he saw the officer look inside before ordering him to lie on the floor, face down. When he moved to the floor the food port was opened and the "thing" (flash-bang) was inserted. The device rolled between his legs as he lay on the floor before exploding. Immediately thereafter, the officers entered the cell, one holding a shield,

yelling "Quit resisting, quit resisting!" His hands and legs were secured and he was walked to the pod classroom and placed in a restraint chair. Lucas stated he suffered burns to both upper thighs, contusions and abrasions to his head and right chest area.

**Claudis Jefferson (X-3277212)**:  Pending charges -- Possession of Narcotic (H.& S. 11350)

In a statement on December 2, inmate Jefferson stated that he was being housed in 400 pod for disciplinary reasons on the lower tier at the time of the flooding. He was not involved in the flooding and denied that he was inciting other inmates during the cell extraction process that was occurring above his cell. An inmate, who was outside Jefferson's cell, moved the door window covering and told him the officers were assaulting the inmates who had caused the flooding and that he (Jefferson) was next. After approximately thirty minutes passed, an officer peered into his cell and told him to get out of the bed and onto the cell floor. Jefferson claimed he was getting out of the bed when a "bomb" (flash-bang) was inserted into his cell and exploded. The cell door opened and a group of officers entered as he was moving face down to the cell floor. He stated he placed his hands behind his back as they yelled "Quit resisting, quit resisting!"  Jefferson accused the officers of assaulting him with hands and knees and choking him from behind while on the floor. He denied resisting, kicking or hitting and displayed a splint on his left arm and wrist that he claims was injured during the extraction.

**CERTIFICATE OF SERVICE**

I, the undersigned, declare as follows:

I am a citizen of the United States, over the age of 18 years and not a party to the within action; my business address is 8549 Nephi Way, Fair Oaks, CA  95628

On August 22, 2006, I faxed, electronically served per the court's electronic filing system, and personally served the attached by depositing with the US mail service a true copy thereof to the persons named below at the address(es) shown in a sealed envelop with postage thereon fully prepaid in the designated area for outgoing mail.

Randolph, Cregger & Chalfant, LLP
Robert Chalfant
1030 G Street
Sacramento, CA  95814
FAX: (916) 443-2124
PHONE: (916) 443-4443

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing

is true and correct and that this is a declaration executed on August 22, 2006, at Fair Oaks, California.

/s/ Gary W. Gorski
Gary W. Gorski